The FIRST NATIONAL BANK OF
BOSTON (INTERNATIONAL),
Plaintiff-Appellee,

v.

BANCO NACIONAL DE CUBA,
Defendant-Appellant.

No. 166, Docket 80–7299.

United States Court of Appeals,
Second Circuit.

Argued Jan. 26, 1981.

Decided Aug. 4, 1981.

Victor Rabinowitz, New York City (Michael Krinsky, Judith Levin, Ellen Winner, Jules Lobel, Susan Davis (Third Year Law Student), Rabinowitz, Boudin, Standard, Krinsky, & Lieberman, New York City, on the brief), for defendant-appellant.

Robert B. Fiske, Jr., New York City (James W. B. Benkard, James L. Kerr, Davis, Polk & Wardwell, New York City, on the brief), for plaintiff-appellee.

Before LUMBARD, VAN GRAAFEILAND, and KEARSE, Circuit Judges.

**KEARSE, Circuit Judge:**

This is one of six appeals decided today in cases arising out of expropriations of property of American companies by the Republic of Cuba in 1960.[1] In the present action,[2] plaintiff-appellee First National Bank of Boston (International) ("BBI") brought suit as assignee of First National Bank of Boston ("Boston") against Banco Nacional de Cuba ("Banco Nacional") to recover $1,675,749 for letters of credit paid by Boston for which it was not reimbursed. The letters of credit were issued by Boston's Cuban branches ("Branches") before the Branches were expropriated by Cuba; some were paid by Boston before the expropriation; the bulk were paid afterwards. Banco Nacional denied liability and counterclaimed to recover $58,461 deposited with Boston by Banco Nacional, plus $500 deposited with Boston by a bank to which Banco Nacional is successor, which sums Boston had refused to repay. The United States District Court for the Southern District of New York, Charles L. Brieant, Jr., Judge, rejected all of Banco Nacional's defenses and counterclaims and entered judgment in favor of BBI in the amount requested.

For the reasons below we reverse the judgment insofar as it allowed BBI to recover on its claims, and we affirm insofar as it dismissed Banco Nacional's counterclaim.

I.

The events surrounding the Cuban revolution, which resulted in the installation of the revolutionary government on January 1, 1959, have been much discussed in the courts. We assume familiarity with our decision today in Banco Nacional de Cuba v. Chase Manhattan Bank, Nos. 80–7375,

---

1. The other five cases are Banco Nacional de Cuba v. Chase Manhattan Bank, Nos. 80–7375, –7377, 658 F.2d 875 (2nd Cir.); Banco Para El Comercio Exterior de Cuba v. First National City Bank, No. 80–7297, 658 F.2d 913 (2nd Cir.); Banco Nacional de Cuba v. Chemical Bank New York Trust Co., No. 80–7209; Banco Nacional de Cuba v. Irving Trust Co., No. 80–7205; and Banco Nacional de Cuba v. Manu-

facturers Trust Co., No. 80–7215. The last three cases were argued together and decided in a single opinion, 658 F.2d 895 (2nd Cir.).

2. Suit was commenced in the Supreme Court of the State of New York, New York County, and was removed to federal court pursuant to 28 U.S.C. §§ 1331, 1332, and 1441 (1976).

–7377, 658 F.2d 875 (2nd Cir.) (*"Chase"*), and with the cases cited in the margin.[3]

## A. The Parties and Their Progenitors

Plaintiff BBI is a wholly-owned Edge Act [4] subsidiary of Boston, the assignor of the claims BBI asserts. Boston is a national banking association organized under the laws of the United States; its principal office is in Boston, Massachusetts. In 1923 Boston established a branch in Cuba, and in 1960 it had that branch and five "sub-branches" operating there.

The Branches were organized under 12 U.S.C. § 601 et seq. (1976) as unincorporated foreign branches of Boston and operated under Boston's name; the name on the Cuban offices was simply the Spanish equivalent of "First National Bank of Boston, organized [or founded] in 1789." The Branches were capitalized by Boston's investment of $3,000,000 in the form of United States government bonds, which remained in the name of Boston; the interest earned on them was credited to the Branches. Branches had no president or board of directors. Their day-to-day operations were supervised by a "Management Group," which hired all officers for the Cuban operations. The members of the Management Group were recommended by Boston. Branches kept their own books of record, paid Cuban taxes, and remitted their profits to Boston, which included these profits in their own annual reports and paid United States taxes on them.

Banco Nacional, as set forth in greater detail in *Chase, supra*, is the central bank of Cuba. It was organized in 1948 by the Republic of Cuba to operate as a separate and autonomous juridical entity. Prior to the revolution one-half of its stock was owned by the Cuban government (which appointed its president and three of its five directors), with the remaining one-half owned, as required by Cuban law, by the private banks operating in Cuba. Since prior to the Cuban revolution Banco Nacional has engaged in domestic and international banking, has been the sole depository of state funds, and has had extensive powers to control and protect the Cuban currency in international trade. Prior to October 13, 1960 it regulated all private commercial banks operating in Cuba. After that date there were no private banks, and Banco Nacional was wholly owned by the Cuban government.

## B. The Letter of Credit Transactions

Prior to the expropriations, Branches regularly engaged in the issuance of letters of credit to Cuban importers seeking to purchase foreign goods. The usual letter of credit transaction had several stages. First, a Cuban customer applied to Branches for a letter of credit; accompanying this application would be an application for an import license. If a Branches officer approved the letter of credit application, he would send the import license application to Banco Nacional's foreign exchange control department, where it was reviewed on behalf of the Cuban Currency Stabilization Fund, which controlled foreign payments by Cuban businesses. If Banco Nacional approved the license application, it would send the import license to Branches. Following further review by Branches of the letter of credit application, Branches would send both the license and the letter of credit application to Banco Nacional for a final review. Final approval was given by Banco Nacional in every case in which initial approval had been given, and the papers were

---

**3.** *See, e. g., Banco Nacional de Cuba v. First National City Bank*, 270 F.Supp. 1004 (S.D.N.Y. 1967), *rev'd*, 431 F.2d 394 (2d Cir. 1970), *vacated and remanded*, 400 U.S. 1019, 91 S.Ct. 581, 27 L.Ed.2d 630 (1971), *on remand*, 442 F.2d 530 (2d Cir. 1971), *rev'd*, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972), *on remand*, 478 F.2d 191 (2d Cir. 1973) ("Banco I"); *Banco Nacional de Cuba v. Sabbatino*, 193 F.Supp. 375 (S.D.N.Y.1961), *aff'd*, 307 F.2d 845 (2d Cir.

1962), *rev'd*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), *on remand, sub nom. Banco Nacional de Cuba v. Farr*, 243 F.Supp. 957 and 272 F.Supp. 836 (S.D.N.Y.1965), *aff'd*, 383 F.2d 166 (2d Cir. 1967), *cert. denied*, 390 U.S. 956, 88 S.Ct. 1038, 20 L.Ed.2d 1151 (1968).

**4.** The Edge Act, 12 U.S.C. §§ 611–632 (1976), governs the organization of corporations to conduct foreign banking.

returned to Branches. In most cases the Cuban buyer was required to deposit Cuban pesos with Branches before the letter of credit would issue. When the pesos were deposited, Branches would issue the letter of credit and send it to Boston; Boston would confirm the credit and send the confirmation and the letter of credit to the seller. After the seller had shipped the goods to the Cuban buyer, he would present his confirmed letter of credit, along with the shipping documents, to Boston and receive payment from it in U.S. dollars. On any letter of credit issued by Branches and paid by Boston, Boston charged the amount paid against Branches' account. Branches replenished their account daily by purchasing U.S. dollars from Banco Nacional with pesos received from its Cuban letter of credit customers, and sending the dollars to Boston.

At issue in the present action are 324 letters of credit that were issued by Branches, approved by Banco Nacional, and confirmed by Boston prior to September 17, 1960. A small number of these, totaling $177,282, were paid by Boston prior to that date; the great bulk of them, totaling $1,498,466, were paid by Boston between September 17 and November 23, 1960. Between September 17 and November 23, Boston requested, but did not receive, assurances from Banco Nacional that Boston would be reimbursed for these payments. In an effort to ensure reimbursement, Boston withheld from the Cuban buyers the shipping documents that they ordinarily would have needed in order to obtain possession of the goods. This effort was thwarted, however, since Banco Nacional intervened to procure the release of the goods without the usual documentation.

## C. The Expropriation

On July 6, 1960, following the deterioration of relations between Cuba and the United States, Cuba enacted Law No. 851 which, inter alia, authorized officials of the Republic to "proceed to nationalize, through forced expropriations, the properties or enterprises owned by physical and corporate persons who are nationals of the United States of North America ...."[5] On September 17, 1960, Resolution No. 2 pursuant to Law No. 851 expropriated and nationalized all of Boston's Cuban branches, and placed Banco Nacional in charge. The Resolution read in part as follows:

### We Resolve:

First: To order the nationalization, by expropriation, and, consequently, award to the Cuban Government, in absolute ownership, all the assets, rights and shares deriving from the utilization thereof, especially the banks, including all their branches and agencies located in Cuba, which are the property of the following legal persons:

1—The First National City Bank of New York

2—The First National Bank of Boston

3—The Chase Manhattan Bank

Second: Consequently, the Cuban Government is substituted for the legal persons named in the foregoing paragraph as to the aforesaid assets, rights and shares, as well as the assets and liabilities of the aforementioned companies.

\* \* \* \* \* \*

Fourth: ... the President of the National Bank of Cuba is assigned to take over, with all the authority inherent in his office, the administration of the assets and banking businesses which are the subject of the action decreed in the present Resolution.

On September 17, 1960, Banco Nacional took physical possession and control of Branches' assets and operations. It has not reimbursed Boston for any of the 324 letter of credit payments.

Following the expropriation Boston collected from various sources a total of $941,-

5. The translations of Law No. 851 provided by the parties in *Chase, supra,* and *Banco Para El Comercio Exterior de Cuba, supra,* note 1, respectively, differ somewhat from that provided in the present case, as well as from each other.

470 in the Branches account, representing funds received from Banco Nacional in September 1970, the proceeds of a number of "bought bills" belonging to Branches, and Branches' correspondent balance with other banks.

## D. *The Present Lawsuit*

BBI, as assignee, brought the present lawsuit to recover $1,675,749, the total of Boston's unreimbursed payments on the letters of credit. As BBI's claim progressed from the complaint stage to the trial stage, essentially two supporting theories evolved. First, BBI contended that the Branches were liable to Boston for the letters of credit, and that pursuant to Resolution No. 2 Banco Nacional had assumed all liabilities of Branches. Second, BBI contended that Banco Nacional had breached a contract "implied in fact" on the basis of the prior course of dealings and representations of a senior official of Banco Nacional.

Banco Nacional answered BBI's complaint principally by denying that it had assumed Branches' obligations, denying that it had failed to make any payments to Boston with respect to the letters of credit, and generally denying all liability. It asserted counterclaims against BBI to recover more than $58,000 in deposits, which Boston asserted it had retained to offset losses resulting from the expropriation of the Branches. On the day of trial Banco Nacional was permitted to amend its answer to assert that adjudication of BBI's claim was barred by the act of state doctrine. In addition, Banco Nacional has argued that any amount recoverable by BBI should be reduced by the $941,470 accumulated by Boston in Branches' account following the expropriation.

## E. *The District Court's Decision*

A bench trial was held before Judge Frederick van Pelt Bryan, who died before a decision could be rendered. Thereafter the case was reassigned to Judge Brieant, who, with the consent of the parties, rendered a decision on the basis of the record made before Judge Byran.

Judge Brieant rejected both of the theories on which BBI's complaint was based. He found that there was no contract "implied in fact," a finding not challenged here by BBI. In addition, he found that because Boston and Branches were not separate and distinct entities there could be no debt owing from Branches to Boston, and hence no liability for Banco Nacional to assume upon nationalization of the Branches. Nevertheless, the district judge ruled in favor of BBI, relying on a theory of unjust enrichment. He stated that, since Banco Nacional succeeded to Branches' assets, it

> became entitled to and did collect the avails of the customers' side of the letter of credit transactions in pesos in Cuba, while BBI in New York, or Boston, in Massachusetts, were required to and did, pay the beneficiaries' side of the transactions in dollars. Thereby, as the successor of the Branches, Banco Nacional became obligated in *quasi* contract to pay Boston or BBI for having accepted the burdens of these transactions, inasmuch as it had derived the benefit.

Opinion at 8.

The district court rejected both Banco Nacional's formally pleaded counterclaims and its contention that the $941,470 collected by Boston for Branches' account should reduce the amount of any recovery by BBI. The court found that prior to the lawsuit Banco Nacional had not given instructions to Boston as to the purpose of any payment from Banco Nacional, and that in these circumstances Boston was entitled to set off these amounts against its losses from the expropriation of Branches rather than against its losses on the letter of credit transactions.

## II. BBI'S CLAIM

On this appeal Banco Nacional argues principally that the judgment against it should be reversed because the act of state doctrine bars BBI's recovery and because Banco Nacional is not subject to the jurisdiction of the court under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–11 (1976). BBI, for its part, contends that

the district court's ruling that Banco Nacional is liable for unjust enrichment is correct, and that in any event the judgment may be upheld on the ground that Banco Nacional is expressly obligated to Boston under the terms of Resolution No. 2.

We find no error in Judge Brieant's ruling that Boston and Branches were not separate entities and we therefore concur in his rejection of the proposition that Banco Nacional assumed liabilities of Branches to Boston. We must reject, however, his conclusion that Banco Nacional is liable on a quasi contract, or unjust enrichment, theory since we find recovery on such a basis barred by the act of state doctrine.[6]

### A. The Assumption of Liability Theory

An indispensable premise of BBI's contention that Banco Nacional assumed Branches' obligations to Boston is that Branches and Boston were separate entities. The district court properly rejected this proposition in light of the legal framework within which Branches was created and the facts surrounding the Boston-Branches operation.

Boston's Branches were organized under the Federal Foreign Banking Law, 12 U.S.C. §§ 601–04, 611–32 (1976). Under this statute the Branches were not, and could not lawfully have been organized as separate corporations. 12 U.S.C. §§ 601, 603. Although foreign branches maintain separate books of account pursuant to 12 U.S.C. § 604, that section "is nothing more than a 'bookkeeping' statute, designed to make examination into the financial condition of national banks, particularly the foreign operations of such banks, as simple as possible." First National City Bank v. Internal Revenue Service, 271 F.2d 616, 619 (2d Cir. 1959), cert. denied, 361 U.S. 948, 80 S.Ct. 402, 4 L.Ed.2d 381 (1960). Given the federal statutory scheme, federal agencies and officials have long viewed a national

bank and its branches as a single entity. For example, in 1917, counsel to the Federal Reserve Bank gave an opinion to the Governors of the Federal Reserve Board as follows:

> There is nothing in this language [12 U.S.C. § 601–604] to indicate that branches established in foreign countries are to have a separate existence and constitute separate corporations. On the contrary, it is clear that the parent bank is merely to engage in certain foreign transactions through its foreign branch. This view is substantiated by the fact that the profit and loss accruing to each bank is to be entered on the general ledger of the parent bank at the end of each fiscal year.

3 Federal Reserve Bulletin 198, 199 (1917). And a current interpretation by the Federal Reserve Board reads as follows:

> Identity of foreign branches with parent bank.—A foreign branch established by a national bank is not an independent corporation and the creditors of the branch are general creditors of the parent bank. . . .

Published Interpretations of the Board of Governors of the Federal Reserve System § 5600 (1980). Cf. also United States v. First National City Bank, 379 U.S. 378, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965), holding that a suit against a national bank gave the court jurisdiction to require that actions be taken by its foreign branch, and stating that a national bank "has actual, practical control over its [foreign] branches; it is organized under a federal statute, 12 U.S.C. § 24, which authorizes it 'To sue and be sued, complain and defend, in any court of law and equity, as fully as natural persons' —as one entity, not branch by branch." Id. at 384, 85 S.Ct. at 531. Thus, federal law regards a national bank and its branches as a single entity.[7]

Within this legal framework, the district court found that while Branches had some

6. We therefore need not reach the Foreign Sovereign Immunities Act defense, which was rejected by the district court on its merits and which BBI contends is, in any event, untimely.

7. We do not regard Pan-American Bank & Trust Company v. National City Bank, 6 F.2d

762 (2d Cir. 1925), as requiring a different conclusion. The case involved a letter of credit issued by National City Bank ("Citibank"), which was paid in Brazil by its Rio de Janeiro branch. When the purchaser of the letter of credit refused to pay Citibank, Citibank sued. BBI relies on various language in the majority

operating autonomy, they were never considered to be nor held out to be an entity separate from Boston. There is evidence to support these findings, including the facts that Branches were capitalized with $3,000,000 in bonds that remained in Boston's name, that Branches' Management Group were recommended by Boston, that Boston paid U.S. taxes on Branches' profits, and that Branches operated under the style, "First National Bank of Boston, founded in 1789." We cannot say that the finding that Boston and its Branches were a single entity is clearly erroneous.

 Since Boston and its Branches were not distinct entities, any obligations of one to the other were not matters of substance but, as the district court concluded, merely matters of internal bookkeeping. There were, therefore, no liabilities of Branches to Boston for Banco Nacional to assume.

## B. *The Unjust Enrichment Theory*

The basis on which the district court upheld BBI's claims was that when Banco Nacional took over the pesos deposited with Branches by the Cuban purchasers of the letters of credit, leaving Boston to pay the beneficiaries of those letters, Banco Nacional was unjustly enriched:

> Banco Nacional ... took over the going business being conducted in Cuba by [Branches], and receiving the avails, became liable in *quasi* contract for the countervailing burdens of the transactions.

Opinion at 14. This view cannot be sustained.

 As a general matter the act of state doctrine bars courts from examining the validity of an expropriation of property by a foreign sovereign in its own territory. *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); *see Chase, supra.* There is no question here that Banco Nacional, acting as an alter ego of the Cuban government, *see Chase, supra; Banco Nacional de Cuba v. First National City Bank,* 478 F.2d 191, 193–94 (2d Cir. 1973), succeeded to the Branches' assets through an act of "nationalization through forced expropriation" pursuant to a Law and a Resolution of the Cuban government. Given these facts, we see no basis for refusing to apply the act of state doctrine to bar BBI's present claims. As we stated in *Menendez v. Saks & Company,* 485 F.2d 1355 (2d Cir. 1973) ("*Menendez*"), *rev'd on other grounds sub nom. Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) ("*Alfred Dunhill*").

> [n]o authority has been cited for the proposition that the act of state doctrine does not apply to a quasi-contractual claim based on unjust enrichment .... Nor has any sound reason been advanced in support of such an exception.

485 F.2d at 1370. Indeed, were there an unjust enrichment exception to the act of state doctrine, we would expect the exception to swallow the rule, for virtually every taking will enrich the sovereign,[8] and to the extent that compensation is not paid that enrichment will have been unjust. We may not avoid application of the act of state doctrine by simply compartmentalizing the expropriation and narrowing our sights to the precise injustice associated with the taking of a particular asset.

---

opinion that appears to have no relation to the facts or outcome of the case. To the extent, for example, that the majority opinion suggests that the Brazilian branch of Citibank could have sued Citibank, *id.* at 769, it surely was dictum, since no such suit was attempted. And the language suggesting that Citibank and its branch were separate entities, *id.* at 767—which BBI argues was needed to deal with a defense that the branch's payment would not have conformed to New York law—seems to have been immaterial to the outcome of the case, since the court went on to note that the branch's payment in Brazil had been in conformity with the law, usage, and trade of Brazil, *id.* at 769. In any event there is no reason in law or logic why the same entity cannot be both the issuing and the paying bank in a letter of credit transaction, *see* H. Harfield, Letters of Credit 9–11 (1979).

8. For a description of an expropriation that appeared to be economically detrimental to the expropriating state, *see* Lillich, *The Valuation of Nationalized Property in International Law: Toward a Consensus or More "Rich Chaos"?,* in III The Valuation of Nationalized Property in International Law 202 n.98 (Lillich ed. 1975).

Nor do we find any exception to the doctrine availing to BBI. If there were a "commercial activity doctrine," *see Alfred Dunhill, supra*, 425 U.S. at 695–706, 96 S.Ct. at 1861–1866 (plurality opinion of Justice White),[9] we would not view it as applicable here since the liability sought to be imposed on Banco Nacional does not arise out of its own commercial activity, but rather results from the pre-expropriation activities of Boston and Branches. All 324 letters of credit were issued by Branches and confirmed by Boston prior to the expropriation. Those that were paid prior to the expropriation obviously were not commercial obligations of Banco Nacional. As to the letters that were paid after the expropriation, the payments were made by Boston with no participation, encouragement, or reassurance—although Boston solicited reassurance as to reimbursement—by Banco Nacional. We do not view Banco Nacional's intercession aiding Cuban buyers to gain possession of the shipped goods without proper documentation as a commercial activity. Nor can we construe as a commercial activity Banco Nacional's collection of pesos from those few Cuban buyers who had not already paid for their letters of credit. Banco Nacional obtained the right to collect those pesos, along with all debts owed Branches, by means of the expropriation. In all, we are at a loss to see what commercial activity of Banco Nacional could have given rise to BBI's claims.

Finally, the decision of the Supreme Court in *First National City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972), does not advance BBI's cause. That case held that the act of state doctrine did not bar adjudication of a counterclaim for expropriation where the Executive Branch of the United States government has advised the courts that it believes the act of state doctrine

need not be applied,[10] where there was no showing that adjudication would interfere with delicate foreign relations, and where the amount of the counterclaim did not exceed the value of the sovereign's claim. *See Chase supra.* This exception is obviously not applicable to the present case since the action was initiated not by Banco Nacional but by BBI, and since BBI seeks not merely a setoff against Banco Nacional's claims, but an affirmative award of damages.

We conclude that BBI's claims should have been dismissed on the basis of the act of state doctrine.

### III. BANCO NACIONAL'S COUNTERCLAIMS

Finally, we turn to Banco Nacional's counterclaims for recovery of its deposits withheld by Boston. The district court dismissed the counterclaims on the ground that Boston had properly applied the funds in Banco Nacional's account to offset Boston's losses from the expropriation of its Cuban assets. We need not reach the merits of this rationale because we conclude that the dismissal of BBI's claims requires the dismissal of Banco Nacional's counterclaims.

When a plaintiff sues on a claim as an assignee, the defendant may assert a counterclaim against the assignee based on a right of action against the assignor; the defendant's recovery on such a counterclaim, however, is limited to the amount of the assignee's recovery. *Marley v. United States*, 423 F.2d 324, 338 (Ct.Cl.1970); *Riverside Park Realty Co. v. Federal Deposit Insurance Corp.*, 465 F.Supp. 305, 316 (M.D. Tenn.1978); *First Acceptance Corp. v. Kennedy*, 95 F.Supp. 861, 872 (N.D.Iowa 1951). *Cf.* Restatement (Second) of Judgments § 56, Comment b, Illustration 4 at 62–63 (Tent. Draft No. 1, 1973).

---

9. In *Menendez*, we declined to hold that the act of state doctrine does not apply to a foreign sovereign's commercial activities. While Part III of Justice White's opinion in *Alfred Dunhill* espoused a commercial activity exception to the doctrine, that portion of the opinion was joined by only four Justices.

10. Such advice is commonly called a "*Bernstein*" letter after the decision of this court in *Bernstein v. N.V. Nederlandsche-Amerikaansche Stoomvaart-Maatschappij*, 210 F.2d 375 (2d Cir. 1954). We are unaware of any *Bernstein* letter with respect to the present litigation.

In the present case the plaintiff is BBI, assignee of Boston's claims. Banco Nacional's right of action, asserted in its counterclaims, is against Boston, not BBI. Banco Nacional cannot, therefore, recover more on these counterclaims than BBI recovers against it. Since we have held that BBI's claim must be dismissed, Banco Nacional's claims also must be dismissed.

## CONCLUSION

The judgment of the district court is affirmed insofar as it dismissed Banco Nacional's counterclaim, reversed insofar as it granted BBI's claims, and remanded with instructions to dismiss BBI's complaint.