**Ida MORELLI, Plaintiff–Appellant,**

v.

**CEDEL, Defendant–Appellee.**

**No. 546, Docket 97–7277.**

United States Court of Appeals, Second Circuit.

Argued Oct. 21, 1997.

Decided March 26, 1998.

---

Steven G. Eckhaus, Eckhaus & Olson, New York City, for Plaintiff–Appellant.

Gary D. Friedman, Mayer, Brown & Platt, New York City, for Defendant–Appellee.

Before NEWMAN, CALABRESI and CUDAHY,* Circuit Judges.

CUDAHY, Circuit Judge:

This appeal requires us to decide whether the domestic employees of certain foreign corporations are protected under the Age Discrimination in Employment Act of 1967 (the ADEA), and, if so, whether a foreign corporation's *foreign* employees are counted for the purpose of determining whether the corporation has enough employees to be subject to the ADEA. We answer both questions in the affirmative.

## Background

After the defendant fired the plaintiff, the plaintiff sued the defendant. The plaintiff's amended complaint asserted that the defendant violated the ADEA, 29 U.S.C. §§ 621–634, the Employment Retirement Security Act (ERISA), 29 U.S.C. §§ 1001–1461, and New York State's Human Rights Law, N.Y.Exec.Law §§ 290–301. The district court dismissed the complaint on the grounds that the defendant was not subject to the ADEA, *see* Fed.R.Civ.P. 12(b)(1) (lack of jurisdiction over the subject matter), and that the ERISA count did not state a claim upon which relief could be granted, *see* Fed. R.Civ.P. 12(b)(6). The court also dismissed the state law claim. The plaintiff appeals the dismissal of her federal claims.

As alleged in the complaint, the facts relevant to this appeal are as follows. The plaintiff, Ida Morelli, was born on April 11, 1939. The defendant is a Luxembourg bank. On or about June 29, 1984, the defendant hired the plaintiff to work in its New York office. On or about February 26, 1993, the plaintiff became an assistant to Dennis Sabourin, a manager in the defendant's New York office. Mr. Sabourin summoned the then 54-year-old plaintiff to his office on January 18, 1994, handed her a separation agreement, and insisted that she sign it.

Under the terms of the separation agreement, a copy of which was attached to the complaint, the plaintiff would resign, effective April 30, 1994. She would continue to receive her salary and benefits until the effective date of her resignation, but she would be relieved of her duties as an employee, effective immediately. Both the defendant and the employee would renounce all claims arising out of "their past working relationship." Mr. Sabourin told the plaintiff that she would receive the three months' severance pay, medical coverage for three months, and her pension only on the condition that she sign the agreement on the spot. The plaintiff had never seen the separation agreement before and had no warning that she was going to be asked to resign. But in the face of Mr. Sabourin's ultimatum, she did sign the agreement immediately and returned it to him. The defendant, however, never provided her with a pension distribution.

## Discussion

### 1. Age Discrimination

(a) Does the ADEA cover a U.S.-based branch of a foreign employer?

■ The ADEA was enacted in 1967 to prevent discrimination by employers on the basis of age. *See* Pub.L. No. 90–202, § 2, 81 Stat. 602 (codified at 29 U.S.C. § 621(b)); *Lorillard v. Pons,* 434 U.S. 575, 577, 98 S.Ct. 866, 868, 55 L.Ed.2d 40 (1978). In order to determine whether the defendant is subject to the ADEA, we must first determine whether the ADEA generally protects the employees of a branch of a foreign employer located in the United States.

It is undisputed that Cedel is a foreign employer with fewer than 20 employees in its sole U.S. branch. There being no contested facts on the motion to dismiss under Rule 12(b)(1), we review the district court's dismissal de novo. *See Rent Stabilization Ass'n v. Dinkins,* 5 F.3d 591, 594 (2d Cir. 1993).

■ Section 4(h)(2) of the ADEA provides that "[t]he prohibitions of [the ADEA] shall not apply where the employer is a foreign person not controlled by an American em-

---

* The Honorable Richard D. Cudahy of the United States Court of Appeals for the Seventh Circuit, sitting by designation.

ployer." 29 U.S.C. § 623(h)(2). At a minimum, this provision means that the ADEA does not apply to the *foreign* operations of foreign employers—unless there is an American employer behind the scenes. *See Denty v. SmithKline Beecham Corp.*, 109 F.3d 147, 150–51 (3d Cir.1997). An absolutely literal reading of § 4(h)(2) might suggest that the ADEA also does not apply to the *domestic* operations of foreign employers. But the plain language of § 4(h)(2) is not necessarily decisive if it is inconsistent with Congress' clearly expressed legislative purpose. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313–14 (2d Cir.1995); *see also Matimak Trading Co. v. Khalily*, 118 F.3d 76, 87 (2d Cir.1997); *Haberman v. Finch*, 418 F.2d 664, 666 (2d Cir.1969).

Section 4(h)(2) was not part of the original ADEA. It was added in 1984. *See* Pub.L. No. 98–459, § 802(b)(2), 98 Stat. 1792 (1984); Pub.L. No. 99–272, § 9201(b)(3), 100 Stat. 171 (1986) (clerical correction). The context in which it was added reveals that Congress' purpose was not to exempt the domestic workplaces of foreign employers from the ADEA's prohibition of age discrimination. Instead, the purpose of adding this exclusion was to limit the reach of an extraterritorial amendment adopted as part of the same legislation.

In 1984, before § 4(h)(2) was added, several courts of appeals had concluded that the ADEA did not apply to "Americans employed outside the United States by American employers." *Cleary v. United States Lines, Inc.*, 728 F.2d 607, 610 (3d Cir.1984); *see also, e.g., Thomas v. Brown & Root, Inc.*, 745 F.2d 279, 281 (4th Cir.1984) (per curiam); *Zahourek v. Arthur Young & Co.*, 750 F.2d 827, 828–29 (10th Cir.1984). These decisions were based in part on language in § 7 of the ADEA, 29 U.S.C. § 626, which prescribes enforcement procedures by reference to certain provisions of the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201–219, the national wage and hour law. Those FLSA provisions specify that the FLSA does not apply "with respect to any employee whose services during the workweek are performed in a workplace within a foreign country." 29 U.S.C. § 213(f); *see* 29 U.S.C. § 216(d)(1);

*Cleary*, 728 F.2d at 608–09. The courts of appeals held that the ADEA incorporated the FLSA's prohibition on extraterritorial application. *See, e.g., Cleary*, 728 F.2d at 609. Within a few months of the 1984 court decisions, Congress amended the ADEA in a way that superseded the holding of these cases by "provid[ing] for limited extraterritorial application" of the ADEA. *Denty*, 109 F.3d at 149–50.

The 1984 amendments amplified the definition of "employee" in § 11(f) of the ADEA, which had previously embraced any "individual employed by any employer," except for certain elected public officials and political appointees. *See* Pub.L. No. 90–202, § 11(f) (1967); Pub.L. No. 93–259, § 28(a)(4) (1974). One of the 1984 amendments specified that "[t]he term 'employee' includes any individual who is a citizen of the United States employed by an employer in a workplace in a foreign country." Pub.L. No. 98–459, § 802(a) (1984).

Companion amendments dealt with the cases of foreign persons not controlled by an American employer—now § 4(h)(2) of the ADEA—and foreign corporations controlled by American employers—now § 4(h)(1):

> If an employer controls a corporation whose place of incorporation is in a foreign country, any practice by such corporation prohibited under this section shall be presumed to be such practice by such employer.

*Id.* § 803(b)(2); Pub.L. No. 99–272, § 9201(b)(3) (1986), codified at 29 U.S.C. § 623(h)(1). The amendments also included a "foreign law exception"—now ADEA § 4(f)(1)—insulating employers from liability for "practices involv[ing] an employee in a workplace in a foreign country" where compliance with the ADEA "would cause [the] employer, or a corporation controlled by such employer, to violate the laws of the country in which such workplace is located." Pub.L. No. 98–459, § 803(b)(1) (1984), codified at 29 U.S.C. § 623(f)(1).

The 1984 revision to the definition of "employee" in § 11(f) was intended "to assure that the provisions of the ADEA would be applicable to any citizen of the United States who is employed by an American employer in

a workplace outside the United States." S.Rep. 98–467, at 27 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2974, 3000 (S.Rep.); *see EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 258–59, 111 S.Ct. 1227, 1235–36, 113 L.Ed.2d 274 (1991). The other 1984 amendments, to § 4 of ADEA, conform the ADEA's reach to "the well-established principle of sovereignty, that no nation has the right to impose its labor standards on another country." S.Rep. at 27. Thus § 4(h)(2) of the ADEA merely limits the scope of the amended definition of employee, so that an employee at a workplace in a foreign country is not protected under the ADEA if the employer is a foreign person not controlled by an American employer. *See id.* at 27–28 ("[T]he *amendment*. . . . does not apply to foreign companies which are not controlled by U.S. firms.") (emphasis added). There is no evidence in the legislative history that these amendments were intended to restrict the application of the ADEA with respect to the *domestic* operations of foreign employers.

Further, the plain language of the corresponding foreign-employer exclusions in Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17, and the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101–12213, indicates that a foreign employer's domestic operations are not excluded from the reach of those statutes. The Title VII and ADA exclusions are expressly limited to the "*foreign operations* of an employer that is a foreign person not controlled by an American employer," 42 U.S.C. §§ 2000e–1(c)(2), 12112(c)(2)(B) (emphasis added), so these employment discrimination statutes would apply to a foreign company's domestic operations. It is not apparent why the domestic operations of foreign companies should be subject to Title VII and the ADA, but not to the ADEA. The legislative history of the comparable foreign-employer exemptions of those laws—both added as part of the Civil Rights Act of 1991, *see* Pub.L. No. 102–166, § 109(b)(1), (2), 105 Stat. 1077—contains no indication that Congress intended any such difference in scope between the ADEA and Title VII or the ADA. *See, e.g.*, 137 Cong.Rec. 28,638 (1991) (statement of Sen. Kennedy).

■ If § 4(h)(2) does not exempt the domestic operations of foreign companies from the ADEA, there is no other basis for such an exemption. Because "[t]he Age Discrimination Act is remedial and humanitarian legislation," it should be "construed liberally to achieve its purpose of protecting older employees from discrimination." *Moses v. Falstaff Brewing Corp.*, 525 F.2d 92, 93 (8th Cir.1975). The exemption of the domestic operations of foreign employers from the ADEA would only undermine the purpose of the ADEA to "promote employment of older persons based on their ability rather than age." 29 U.S.C. § 621(b). International comity does not require such an exemption; the 1984 amendments anticipate that American corporations operating abroad will be subject to foreign labor laws, and Congress presumably contemplated that the operations of foreign corporations here will be subject to U.S. labor laws.

■ We have previously concluded that even when a foreign employer operating in the United States can invoke a Friendship, Commerce and Navigation treaty to justify employing its own nationals, this "does not give [the employer] license to violate American laws prohibiting discrimination in employment." *Avigliano v. Sumitomo Shoji America, Inc.*, 638 F.2d 552, 558 (2d Cir. 1981), *vacated on other grounds*, 457 U.S. 176, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982); *see also MacNamara v. Korean Air Lines*, 863 F.2d 1135, 1141 (3d Cir.1988) ("[A] foreign business may not deliberately undertake to reduce the age of its workforce by replacing older Americans with younger foreign nationals."). Although the Supreme Court vacated our judgment in that case on the grounds that the defendant could not invoke the treaty, *see Sumitomo*, 457 U.S. at 189–90 & n. 19, 102 S.Ct. at 2382 & n. 19, the Court observed that "the highest level of protection afforded by commercial treaties" to foreign corporations operating in the United States is generally no more than "equal treatment with domestic corporations." *Id.* at 188 n. 18, 102 S.Ct. at 2381 n. 18. Here equal treatment would require that antidiscrimination rules apply to foreign enterprises' U.S. branches, since "defending personnel

decisions is a fact of business life in contemporary America and is a burden that the domestic competitors of foreign enterprise have been required to shoulder," *MacNamara*, 863 F.2d at 1147. Also, U.S. subsidiaries of foreign corporations are generally subject to U.S. antidiscrimination laws, *see*, *e.g., Fortino v. Quasar Co.*, 950 F.2d 389, 393–94 (7th Cir.1991), and, absent treaty protection—not an issue in this case—a U.S. branch of a foreign corporation is not entitled to an immunity not enjoyed by such subsidiaries. *See Sumitomo*, 457 U.S. at 189, 102 S.Ct. at 2381–82.

We therefore agree with the E.E.O.C., the agency charged with the enforcement of the ADEA, *see* 29 U.S.C. §§ 626, 628; *cf. Ohio Pub. Employees Retirement Sys. v. Betts*, 492 U.S. 158, 170–75, 109 S.Ct. 2854, 2862–66, 106 L.Ed.2d 134 (1989), that the law generally applies "to foreign firms operating on U.S. soil." E.E.O.C. Policy Guidance, N–915.039, Empl.Prac.Guide (CCH) 5183, 6531 (March 3, 1989). For the reasons we have discussed, we are confident that Congress has never clearly expressed a contrary intent. *See Regions Hosp. v. Shalala*, — U.S. —, —, 118 S.Ct. 909, 915, 139 L.Ed.2d 895 (1998).

(b) Are employees based abroad counted in determining whether a U.S.-based branch of a foreign employer is subject to the ADEA?

■ Cedel will still not be subject to the ADEA by virtue of its U.S. operations unless Cedel is an "employer" under the ADEA. A business must have at least twenty "employees" to be an "employer." 29 U.S.C. § 630(b). Cedel maintains that, in the case of foreign employers, only domestic employees should be counted. The district court agreed, and, since Cedel had fewer than 20 employees in its U.S. branch, the court granted Cedel's motion to dismiss for lack of subject matter jurisdiction without considering the number of Cedel's overseas employees.

The initial version of the ADEA, adopted in 1967, did not apply to employers with fewer than 25 employees. *See* Pub.L. No. 90–202, § 11(b), 81 Stat. 605 (codified as amended at 29 U.S.C. § 630(b)). (For a brief transitional period, employers with fewer than 50 employees were not subject to the ADEA. *Id.*) In 1974, the threshold was lowered to its present level. *See* Pub.L. No. 93–259, § 28(a)(1). We first consider whether the ADEA's definition of "employee" might somehow support Cedel's position. Prior to the 1984 amendments, the definition of an employee was simply "an individual employed by any employer," with exceptions, noted above, not relevant in the present case. *See* Pub.L. No. 90–202, § 11(f) (1967); Pub.L. No. 93–259, § 28(a)(4) (1974). This language provides no basis for counting only domestic employees. (Neither does the reasoning of the cases limiting the reach of the pre-1984 ADEA to domestic workplaces, since the portions of the FLSA incorporated into the ADEA—in particular § 13(f) of the FLSA—do not purport to modify the definition of employee under § 3(e) of the FLSA. *See* 29 U.S.C. §§ 213(f), 203(e); *see also, e.g., Cleary*, 728 F.2d at 610.)

The 1984 amendments supplemented the definition of employee in § 11(f) of the ADEA to include U.S. citizens employed in a foreign workplace. This revision to § 11(f) does not establish that the employees, wherever located, of a foreign corporation with a U.S. branch are not "employees" under the ADEA, for it makes no distinction between foreign and domestic employers. As discussed above, the function of adding § 4(h)(2) in 1984 was only to limit a foreign-based employer's ADEA liability with respect to employees in a foreign workplace, and so § 4(h)(2) provides no grounds for counting only Cedel's domestic employees. The word "employee" does not even appear in § 4(h); if Congress had wished to restrict the definition of "employee" to exclude a foreign employer's foreign workers, it certainly could have done so directly when it amended § 11(f) in 1984. The 1984 foreign law exception (§ 4(f)(1)) also does not aid Cedel.

The district court reasoned that the overseas employees of foreign employers should not be counted because they are not protected by the ADEA. But there is no requirement that an employee be protected by the ADEA to be counted; an enumeration, for the purpose of ADEA coverage of an employ-

er, includes employees under age 40, who are also unprotected, *see* 29 U.S.C. § 631(a). The nose count of employees relates to the scale of the employer rather than to the extent of protection.

The legislative history of the ADEA does not address the minimum employee requirement. The ADEA was modeled in large part on Title VII, however, *see McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 357, 115 S.Ct. 879, 884, 130 L.Ed.2d 852 (1995), and we have previously identified several reasons for Title VII's minimum-employee requirement, *see* 42 U.S.C. § 2000e(b) (15 or more employees). These include the burdens of compliance and potential litigation costs, "the protection of intimate and personal relations existing in small businesses, potential effects on competition and the economy, and the constitutionality of Title VII under the Commerce Clause." *Tomka*, 66 F.3d at 1314; *see also id.* at 1322–23 (Parker, J., dissenting).

None of these reasons suggests that whether a foreign employer is subject to the ADEA should turn on the size of its U.S. operations alone. Cedel contends that because it has fewer than 20 employees in the United States, it is the equivalent of a small U.S. employer. This is implausible with respect to compliance and litigation costs; their impact on Cedel is better gauged by its worldwide employment. Cedel would not appear to be any more a boutique operation in the United States than would a business with ten employees each in offices in, say, Alaska and Florida, which would be subject to the ADEA. Further, a U.S. corporation with many foreign employees but fewer than 20 domestic ones would certainly be subject to the ADEA.

Accordingly, in determining whether Cedel satisfies the ADEA's 20–employee threshold, employees cannot be ignored merely because they work overseas.[1] We therefore vacate the judgment on the plaintiff's ADEA count.

[1] We do not follow the district courts that have concluded—without apparent exception—that only the domestic employees of a foreign employer are counted in determining whether the ADEA's 20–employee threshold is met. *See, e.g.,*

## 2. ERISA

■ The plaintiff contends that Cedel violated ERISA by failing to "pay ... her pension." Clause 3.2(f) of the separation agreement, attached to her complaint, reads:

> Pension Plan: Ida [Morelli] shall be paid an unique and tax protected lump sum of USD        on April 30, 1994.

The district court dismissed the plaintiff's ERISA complaint on three grounds: First, the plaintiff failed to allege the existence of an employee pension benefit plan or that she was a participant in, or beneficiary of, such a plan—the only capacities in which Morelli would have standing to sue, *see* 29 U.S.C. §§ 1002(7), 1002(8), 1132(a)(1). Second, even if Morelli had alleged the existence of an ERISA qualified pension benefit plan, she failed to allege facts demonstrating that she was a plan participant or was entitled to benefits under the plan. Third, the sole pension plan Cedel had for its New York employees was implemented during 1994, the year the plaintiff was terminated, and the terms of the plan required that an employee be employed on the last day of the plan year in order to receive an employer contribution. Since the plaintiff did not work for Cedel on the last day of the plan year, she was not entitled to any benefits under the terms of the plan.

■ As a basis for the second and third grounds for dismissing the complaint, the district court relied on an affidavit from the office manager of Cedel's New York office, which stated that "Cedel did not have any pension or retirement benefit plan for its New York employees" until July 1, 1994. Consideration of matters outside the pleadings converts the defendant's motion to dismiss into a summary judgment motion. *See* Fed.R.Civ.P. 12(b); James Wm. Moore et al., *Moore's Federal Practice* § 56.30[4] (3d ed.1997). Although a review of the record below indicates that the plaintiff had enough notice of a potential conversion to permit the trial court to treat the motion as one for summary judgment *sua sponte, see Groden v. Random House, Inc.*, 61 F.3d 1045, 1052–

*Robins v. Max Mara, U.S.A., Inc.*, 914 F.Supp. 1006, 1009 (S.D.N.Y.1996); *cf. Goyette v. DCA Adver.*, 830 F.Supp. 737, 745 (S.D.N.Y.1993) (Title VII).

53 (2d Cir.1995); *Kopec v. Coughlin,* 922 F.2d 152, 154–56 (2d Cir.1991), in relying on matters outside the pleadings, the court should have explicitly disposed of the motion under Rule 56. *See Carter v. Stanton,* 405 U.S. 669, 671, 92 S.Ct. 1232, 1234, 31 L.Ed.2d 569 (1972) (per curiam). We could still address the motion now if that best served judicial economy. *See George v. Kay,* 632 F.2d 1103, 1106 (4th Cir.1980). But since we are already remanding the plaintiff's ADEA claim, and since the viability of the ERISA claim might be affected by the resolution of the ADEA claim, we vacate the judgment on the ERISA count as well. Thus all aspects of the ERISA claim remain open on remand.

Should Morelli succeed on her age discrimination claim, the district court will have an opportunity to determine in the first instance whether, judgment in hand, Morelli might meet the definition of a "participant" entitled to bring a civil action under § 502(a)(1) of ERISA, 29 U.S.C. § 1132(a)(1). In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 117, 109 S.Ct. 948, 957–58, 103 L.Ed.2d 80 (1989), the Supreme Court held that pension-plan "participants" include "former employees who have ... a reasonable expectation of returning to covered employment." 489 U.S. at 117, 109 S.Ct. at 958 (internal quotation marks omitted). If Morelli prevails on her ADEA claim, her status as a participant might depend, for example, on whether "returning to covered employment" means returning to *previously* covered employment or returning to *currently* covered employment.[2]

### Conclusion

The judgment is vacated with respect to the ADEA and ERISA claims and the case is remanded for further proceedings not inconsistent with this opinion.

---

**2.** Because we decline to address the merits of the ERISA motion at this time, we need not now consider whether the filing of an antidiscrimination suit, in itself, would provide a plaintiff with "a reasonable expectation of returning to covered employment." *Compare Mullins v. Pfizer, Inc.,* 23 F.3d 663, 667 (2d Cir.1994) (finding standing established by filing of ERISA claim), *with Winchester v. Pension Comm.,* 942 F.2d 1190, 1193 (7th Cir.1991) (finding standing not conferred by filing of antidiscrimination claim where plaintiff had sufficient opportunity to vindicate ERISA goals while a plan participant).