**Victoria GREENBAUM, Plaintiff,**

v.

**Svenska HANDELSBANKEN, NY, Defendant.**

No. 95 Civ. 3850 (SS).

United States District Court, S.D. New York.

Nov. 12, 1998.

Robert E. Sapir, Cooper, Sapir & Cohen, Melville, NY, Donald L. Sapir, Robert T. McGovern, Steven R. Shapiro, Sapir & Frumkin LLP, White Plains, NY, for plaintiff.

Peter N. Hillman, Debra M. Patalkis, Mitchell P. Hurley, Chadbourne & Parke, New York City, for defendant.

## OPINION AND ORDER

SOTOMAYOR, District Judge.

Following entry of judgment in her favor on her claim of sex discrimination and retaliation in violation of Title VII and the New York City Administrative Code, plaintiff Victoria Greenbaum moves this Court for reconsideration of its decision that the appropriate punitive damages to be applied in this case under Title VII is $50,000. For the reasons to be discussed, the Court grants Greenbaum's motion.

## BACKGROUND

Plaintiff Victoria Greenbaum sued her former employer, Svenska Handelsbanken, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the New York City Human Rights Law, NYC Admin.Code § 8–502, alleging sex discrimination and retaliation for filing an EEOC complaint. Following trial, the jury returned a verdict awarding Greenbaum $320,000 in back pay and $1,250,000 in punitive damages. Because of uncertainty over the proper punitive damages evidentiary standard under the NYC law, the Court charged the jury under both a preponderance and a clear-and-convincing standard; the jury found that punitive damages had been proven by a preponderance but not by clear and convincing evidence.

In an Opinion and Order dated September 23, 1997, familiarity with which is assumed, this Court ruled that the proper evidentiary standard for punitive damages under the NYC law was a preponderance standard, the same as under federal law, and awarded Greenbaum the full $1,250,000 in punitive damages under the NYC law. See Greenbaum v. Svenska Handelsbanken, NY, 979 F.Supp. 973, 983 (S.D.N.Y.1997). To cover the possibility of the punitive damages award under the NYC law being upset either on post-verdict motions or on appeal, the Court also ruled that the punitive damages award was available to the plaintiff under Title VII but was subject to the damages caps of 42 U.S.C. § 1981a. The Court ruled that the appropriate count of employees, upon which the determination of the proper damages cap is based, should be limited to those employees in Svenska Handelsbanken's New York branch ("SNY"). This ruling was grounded in two holdings. First, that SNY's parent bank in Sweden (Svenska Handelsbanken, A.B., hereinafter "SHB") was not, and could not be, a defendant in this Title VII action. See id. Second, relying in part on district court case law holding that the determination of whether a corporation had sufficient employees to be an "employer" under Title VII did not include foreign-based employees, this Court held that even if SHB were properly a defendant, a foreign employer's foreign-based employees should not count towards the number of employees used to determine the punitive damages cap. See id. There being no dispute that SNY had at all relevant times between 14 and 101 employees, the Court capped the punitive damages under Title VII at $50,000. See 42 U.S.C. § 1981a(b)(3)(A).

On March 26, 1998, the Second Circuit decided the case of Morelli v. Cedel, 141 F.3d 39 (2d Cir.1998). In Morelli, the Second Circuit held that domestic employees may sue their foreign-based employer for violations of the Age Discrimination in Employ-

ment Act. *See id.* at 41–44. Further, the court said, when counting employees for the purpose of determining whether jurisdiction over the employer exists under the ADEA (which limits its reach to employers with 20 or more employees), *all* employees of the foreign corporation are counted, not just U.S.-based ones. *See id.* at 44–45. The Court invited a motion for reconsideration of its previous ruling on the appropriate Title VII damages cap in light of *Morelli.*

### DISCUSSION

Under the amendments to Title VII made by the Civil Rights Act of 1991,

> In an action brought by a complaining party under [Title VII] against a respondent who engaged in unlawful intentional discrimination ... the complaining party may recover compensatory and punitive damages ... from the respondent.

42 U.S.C. § 1981a(a)(1). Further,

> A complaining party may recover punitive damages under this section against a respondent ... if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.

42 U.S.C. § 1981a(b)(1).

Punitive damages are subject to a set of damage caps which increase with the number of persons employed by the respondent. *See* 42 U.S.C. § 1981a(b)(3). The sum of compensatory and punitive damages may not exceed, "in the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $50,000." 42 U.S.C. § 1981a(b)(3)(A). The cap increases to a maximum of $300,000 available against those respondents with more than 500 employees. *See* 42 U.S.C. § 1981(a)(b)(3)(D).

The Court agrees with Greenbaum that *Morelli* requires this Court to reverse its earlier ruling that only the domestic employees of a foreign employer count for purposes of the damages cap. First, although *Morelli* dealt with the ADEA, not Title VII, the court relied on the purposes of the minimum-employee requirements of Title VII and imputed those purposes to the ADEA as well, noting that "the ADEA was modeled in large part on Title VII." *Morelli,* 141 F.3d at 45. Moreover, in reaching the conclusion that foreign employers of domestic employees were subject to suit under the ADEA, the *Morelli* court explicitly relied on the reasoning that "it is not apparent why the domestic operations of foreign companies should be subject to Title VII and the ADA, but not to the ADEA," *id.* at 43, and that there was no indication in legislative history that Congress intended the scope of the foreign-employer exemptions to differ among the three statutes. *See id.* The Court thus sees no reason why the holding of *Morelli* should not be fully applicable to the Title VII context. *Accord, Da Silva v. Kinsho Int'l Corp.,* No. 97 Civ. 5030, 1998 WL 560054, at *1, 1998 U.S. Dist. Lexis (S.D.N.Y.1998).

In addition, although *Morelli* involved the minimum-employee jurisdictional requirements of the ADEA, not the damage caps of § 1981a, the Court finds the logic applicable. The purposes of the minimum-employee requirement of Title VII include, *inter alia,* "the burdens of compliance and potential litigation costs." *Morelli,* 141 F.3d at 45; *see also id.* (propriety of subjecting defendant to Title VII liability best judged by the impact on defendant's worldwide operations). As noted in *Morelli,* "the nose count of employees relates to the scale of the employer rather than to the extent of protection." *Id.,* Similarly, the purpose of the punitive damages caps are to "protect employers from financial ruin as a result of unusually large awards." *Luciano v. Olsten,* 110 F.3d 210, 221 (2d Cir.1997).

The defendant responds, however, that the Court's earlier ruling was correct that SHB was never a defendant in this case, *see Greenbaum,* 979 F.Supp. at 983, and that therefore SHB is not properly the "respondent" whose employees must be counted. The plaintiff, however, urges that the New York branch of SHB is not a separate legal entity and that therefore SHB has always been the actual defendant in this case, de-

spite the naming in the caption. The Court agrees with the plaintiff.

To begin with, the Court's earlier ruling was based, in part, on the Court's belief that SHB, as a foreign employer, could not legally be a defendant. *See Greenbaum,* 979 F.Supp. at 983. This holding is obviously now erroneous in light of *Morelli,* which specifically relied on the fact that under Title VII, "a foreign employer's domestic operations are not excluded from the reach of those statutes." *Morelli,* 141 F.3d at 43. Thus, while SHB could not be held liable under Title VII for discrimination in an overseas branch, SHB definitely could have been named as a defendant in this case, for the alleged discrimination occurred at SHB's New York operational branch. SHB was not, however, named in the caption as a defendant; SNY was.

At trial, the plaintiff requested that the caption be changed, based upon evidence presented which suggested that SHB and SNY were not separate legal entities. *See* Tr., at 379–81. This Court recognized that the fact of SNY's juridical status was important to the determination of punitive damages, and allowed the plaintiff to attempt to present evidence at trial if she so desired. Until this motion for reconsideration, however, the issue of SNY's juridical status was not effectively brought back to this Court's attention.

There does not appear to be any evidence that SNY is separately incorporated from SHB; at least, the defendant, despite the opportunity at trial, in its post-verdict briefing on the Court's original opinion on this issue, and in the briefing on this motion for reconsideration, has brought no such evidence to the Court's attention. The plaintiff, moreover, solicited testimony at trial from Harry Roberts, a deputy General Manager of the bank, that SHB and SNY were not separate legal entities. *See* Tr., at 398. While Roberts's opinion cannot be taken as legally conclusive on the issue of SNY's legal status by this Court, it is nevertheless probative evidence as to the fact of SNY's incorpo-

ration. Given the failure of the defendant to rebut this evidence in any way, the Court finds that SNY is not a separate corporation from SHB.[1]

That finding does not end the matter, for SNY could still theoretically have independent juridical status—i.e., the ability to sue or be sued—even though SHB has no corporate shield of liability from SNY's obligations. At first glance the finding of no liability shield would seem to be dispositive in that, since the point of the employee-number requirement is to calibrate punitive damage limits to the size of the employer and its ability to pay, the fact that SHB would be liable for any judgment rendered against SNY would at least support a powerful argument as to why it is SHB's size that is most pertinent to calculating the cap. However, the plain language of § 1981a presents difficulties with this analysis. The cap is based on how many employees the "respondent" has; assuming this word has the same meaning throughout § 1981a, the "respondent" is the entity against whom the "action [is] brought by a complaining party," § 1981a(a). Thus, if SHB is not the entity against whom this action is brought, it would appear not to be the respondent and therefore not the proper basis for the employee count, regardless of whether SHB is potentially liable for the judgment or whether SHB could have been named.

However, the law seems fairly well-settled that the domestic branch of a foreign bank is not a separate legal entity under either New York or federal law. New York has long adhered to the general rule that

> when considered with relation to the parent bank, [branches] are not independent agencies; they are, what their name imports, merely branches, and are subject to the supervision and control of the parent bank, and are instrumentalities whereby the parent bank carries on its business, and are established for its own particular purposes, and their business conduct and policies are controlled by the parent bank, and their property and assets belong to the

1. To the extent that this or other factual findings are necessary for determining the proper punitive damages cap but were not submitted to the jury at trial, the Court now makes these findings pursuant to Fed.R.Civ.P. 49.

parent bank, although nominally held in the names of the particular branches.

*Sokoloff v. National City Bank of N.Y.*, 130 Misc. 66, 73, 224 N.Y.S. 102, 114 (Sup.Ct. 1927) (New York parent bank liable for debts of Russian branch), *aff'd*, 250 N.Y. 69, 164 N.E. 745 (1928); *see also Matter of Liquidation of the New York Agency and Other Assets of Bank of Credit and Commerce Int'l, S.A.*, 90 N.Y.2d 410, 422, 660 N.Y.S.2d 850, 856, 683 N.E.2d 756 (1997) ("A branch or agency of a bank is not a separate entity."). Note also that under the New York Banking Law, a foreign banking corporation authorized to operate a branch or agency in New York may sue and be sued, but there are no similar provisions for the branch itself, *see* N.Y. Banking L. §§ 200–a, 200–b, and the foreign corporation must designate an agent "upon whom all process in any action or proceeding against it [the foreign banking corporation] on a cause of action arising out of a transaction with its New York agency or agencies, may be served...." N.Y. Banking L. § 200(3).

Federal law also proceeds from the starting proposition that branches are not separate entities from their parents. Thus, the D.C. Circuit has held that the foreign branches of a foreign bank have no standing to contest the forfeiture of a defendant parent bank's assets under 18 U.S.C. § 1963(1)(2) because, not being separate entities, the branches are not a "person, other than the defendant." *See United States v. BCCI Holdings (Luxembourg), S.A.*, 48 F.3d 551, 554 (D.C.Cir.1995), *aff'g* 833 F.Supp. 32 (D.D.C.1993), *cert. denied sub nom. Liquidation Commission for BCCI (Overseas) Ltd., Macau v. United States*, 516 U.S. 1008, 116 S.Ct. 563, 133 L.Ed.2d 489 (1995). As stated by the Circuit:

> Our courts have long recognized that, while individual bank branches may be treated as independent of one another, each branch, unless separately incorporated, must be viewed as a part of the parent bank rather than as an independent entity.... Accordingly, we conclude that the branches represented by the appellants have no separate legal identity apart from their parent....

*Id.* The law in the Second Circuit agrees with this basic principle. *See First Nat'l Bank of Boston (Int'l) v. Banco Nacional de Cuba*, 658 F.2d 895, 900–01 (2d Cir.1981) ("federal law regards a national bank and its branches as a single entity") (Cuban branches of Boston bank not separate legal entities and therefore branches could have no liabilities to parent that were assumed when branches nationalized); *Vishipco Line v. Chase Manhattan Bank, N.A.*, 660 F.2d 854, 863–64 (2d Cir.1981) (impossibility of payment by Saigon branch of New York parent bank no defense because parent bank ultimately responsible for liabilities of branch); *see also United States v. First Nat'l City Bank*, 379 U.S. 378, 384, 85 S.Ct. 528, 531, 13 L.Ed.2d 365 (1965) (parent bank "has actual, practical control over its branches; it is organized under a federal statute which authorizes it 'to sue and be sued ...'—as one entity, not branch by branch") (assets in foreign branch subject to freeze order levied against U.S. parent). Note also that, similar to New York banking law, under regulations promulgated by the Comptroller of the Currency pursuant to the International Banking Act, 12 U.S.C. § 3101 et seq., it is the foreign bank which is amenable to service of process at any of its federal branch locations. *See* 12 C.F.R. § 28.21.

It is true that, for certain purposes, both New York and federal law treat branches as separate entities. Thus, for example, under the New York version of the Uniform Commercial Code, a bank's liability for the actions of one of its branches is governed by the law of the place where the branch, not the parent, is located. *See* N.Y.U.C.C. Law § 4–102(2); *see also* N.Y.U.C.C. Law § 4–106 (branch considered separate bank for purposes of place or time of performance); § 4–A–105 (branch considered separate bank for purposes of funds transfers). Attachments served on one branch are not effective to garnish an account at a different branch of the same bank, at least under federal admiralty law. *See Reibor Int'l Ltd. v. Cargo Carriers (KACZ–CO.) Ltd.*, 759 F.2d 262, 264 (2d Cir.1985); *Det Bergenske Dampskibsselskab v. Sabre Shipping Corp.*, 341 F.2d 50, 53–54 (2d Cir.1965); *but see Digitrex, Inc. v.*

*Johnson,* 491 F.Supp. 66, 69 (S.D.N.Y.1980) (service of attachment on main office sufficient to attach accounts at branch) (applying New York law); *S & S Machinery Corp. v. Manufacturers Hanover Trust Co.,* 219 A.D.2d 249, 252, 638 N.Y.S.2d 953, 955 (1st Dep't 1996) (approving *Digitrex* rule).

The rationale for the so-called "separate entity" rule, however, has to do with the practical realities of branch banking—namely, that branches cannot (or could not, at the time the rules were first formulated) communicate instantaneously and therefore, in order to avoid multiple liabilities, a bank must be able to limit its responsibilities to one branch at a time:

> Unless each branch of a bank is treated as a separate entity for attachment purposes, no branch could safely pay a check drawn by its depositor without checking with all other branches and the main office to make sure that no warrant of attachment had been served upon any of them.... This would place an intolerable burden upon banking and commerce, particularly where the branches are numerous, as is often the case.

*Det Bergenske,* 341 F.2d at 53 (quoting *Cronan v. Schilling,* 100 N.Y.S.2d 474, 476 (Sup. Ct.1950)). It was precisely because this was the rationale for the separate entity rule that Judge Whitman Knapp first called into question its continuing validity in *Digitrex:*

> The operations at most if not all New York City commercial banks ... have become largely computerized.... Consequently it is clear that the argument in favor of the rule set forth in 1950 in *Cronan* is no longer persuasive.

*Digitrex,* 491 F.Supp. at 68. The same concerns for practicality underlie other situations where branches are treated as separate entities. *See, e.g.,* N.Y.U.C.C. Law § 4–106, Official Cmt.

Clearly, however, the rationale which underlies these limited exceptions to the legal identity of a bank and its branches have no application to Title VII law. There is no practical reason, for example, why a parent bank would be stifled by distance or communication impracticalities in its ability to defend against an action based on alleged Title VII violations at one of its branches. Moreover, a foreign bank may not, under federal law, establish domestic operations absent its pledge to "conduct all of its operations in the United States in full compliance with" federal and state anti-discrimination provisions. *See* 12 U.S.C. § 3106a(2)(A). Thus, this Court finds the general principle applicable that a branch bank is not a separate legal entity from its foreign parent, and in the same way that an unincorporated division of a corporation cannot be sued or indicted, *see BCCI (Luxembourg),* 833 F.Supp. at 38–39, SNY was not the proper party defendant, SHB was. The plaintiff's request at trial to correct the caption to reflect Svenska Handelsbanken, A.B. as the proper defendant should have been granted.

The defendant argues that it is now unfair to allow this substitution, because "had SHB been a defendant, the entire complexion of this case would have been different." Def. Reply Letter, at 1. For example, says the defense, "discovery (and trial) surely would have escalated into examination of SHB's employment practices world-wide." *Id.* The Court disagrees. It is difficult to understand how more limited discovery prejudiced the defendant. It was the defendant who vigorously, and in most instances, successfully opposed the expansion of discovery into its worldwide operations. Further, when plaintiff brought the legal status of SNY to the Court's attention, the Court indicated that the sole relevance of substituting SHB for SNY would be on the punitive damages cap. *See* Tr., at 380. SHB's worldwide practices were not at issue in this case; only SHB's U.S. operations were subject to Title VII and the New York antidiscrimination laws. Moreover, there is no question of unfair surprise in this change. First, SHB is amenable to process under both federal and New York law, and was therefore properly served. Second, SHB was clearly on notice of the suit against SNY, as officers of SHB testified at trial that they knew of Greenbaum's EEOC filings. Finally, since SNY was not a separate corporate entity from SHB, SHB knew all along that it had no shield from liabilities incurred by SNY.

The Court thus finds that the proper "respondent" for purposes of the § 1981a(b)(3) is the parent bank, Svenska Handelsbanken, A.B. Further, under the Second Circuit's ruling in *Morelli,* the entire worldwide employment of SHB is to be counted. Because the parties do not dispute that SHB has over 500 employees, the proper punitive damages cap under Title VII is $300,000.

### CONCLUSION

For the foregoing reasons, the Court grants the plaintiff's motion for reconsideration. The Court will cap the punitive damages available under Title VII at $300,000.

**SO ORDERED.**