William **DARDEN**, Plaintiff,

v.

**DAIMLERCHRYSLER NORTH AMERICA HOLDING CORPORATION, Daimlerchrysler Corporate Services Inc., Mercedez–Benz USA LLC, Daimlerchrysler A.G. and Christl R. Gaiser, Defendants.**

No. 01 Civ. 5056(VM).

United States District Court,
S.D. New York.

March 14, 2002.

Eleanor Jackson Piel, New York City, for Plaintiff.

Michael M. Connery, Skadden, Arps, Slate, Meagher & Flom, L.L.P., New York City, for Defendants.

### DECISION AND ORDER

MARRERO, District Judge.

Plaintiff William Darden ("Darden") brought this action against defendants DaimlerChrysler North America Holding Corporation ("NAH"), DaimlerChrysler Corporate Services Inc. ("CSI"), Mercedes–Benz USA LLC ("MBUSA"), Daimler Chrysler A.G. ("DCAG") and Christl R. Gaiser ("Stoekl") (collectively "Defendants"). Darden's claims include: (1) racial discrimination, harassment and retaliation in violation of 42 U.S.C. § 2000e ("Title VII"), 42 U.S.C. § 1981 (" § 1981") and New York State and City human rights laws ("HRL"), (2) age discrimination in violation of 29 U.S.C. § 623(a) (the "ADEA") and New York State and City HRL, and (3) breach of contract causing loss of severance pay. In response, Defendants filed a motion, pursuant to Federal Rules of Procedure 12(b)(1), 12(b)(5) and 12(b)(6), to dismiss parts of the complaint as to certain Defendants. Darden opposes the motion. For the reasons set forth below, the Court grants Defendants' motion in part and denies the motion in part.

### I. BACKGROUND

According to the Amended Complaint ("Complaint" or "Compl."), Darden was employed as a limousine driver by MBUSA from February 1978 to January 1990. Darden was the only African American limousine driver employed by Defendants. In January of 1990 he was transferred to Daimler Benz North America Corporation, which company "became" NAH in late 1999. CSI is a New York subdivision of NAH. (Compl., ¶ 4.) Darden alleges that DCAG is a German corporation that maintains an office in New York at the CSI offices. (Compl., ¶ 7.) CSI is also a subsidiary of DCAG. (Compl., ¶ 11(d).)

From 1990 through 1999, Darden worked for Timotheus R. Pohl ("Pohl"), who was then Vice Chairman of NAH. In 1999, Pohl retired and Darden's employment contract was transferred to CSI, without change to his health, pension or retirement benefits. (Compl., ¶ 10.) Throughout this time, Darden's job performance was satisfactory and his services were personally requested by the executives he chauffeured. Darden's new supervisor was Stoekl, then named Christl Gaiser.

Darden's claims arise out of his experiences working for Stoekl, who "commenced a calculated campaign of racial harassment and terror against him." (Amended Memorandum of Law in Opposition to Defendants' Motion for the Partial Dismissal of the First Amended Complaint "Pl.'s Mem., at 3.") Darden provided detailed accounts of certain incidents. To briefly summarize, on one occasion Stoekl asked Darden to "work off the books" for her and, making reference to his age, she stated that she planned to "get rid of him" by the end of the year; at that time also Stoekl indicated that her job was secure because she used to work for Juergen E. Schrempp ("Schrempp"), " 'the overall boss of the company in Germany.' " (Compl., ¶ 11(c).) In addition, Darden alleges she made racial slurs while threatening his continued employment on at least four memorable occasions. As further harassment, Darden felt that Stoekl was imposing unreasonable demands on him. Darden asserts, for instance, that Stoekl instructed him not to speak to his passengers and to make deliveries that conflicted with his chauffeur responsibilities, which caused him to re-injure his back. Darden

alleges that he filed a grievance against Stoekl, but he does not state for what or with whom he filed this grievance.

Darden filed a complaint against CSI and MBUSA with the EEOC on April 13, 2000. On that same day Stoekl gave Darden a letter requesting his transfer from CSI to MBUSA, in New Jersey. His new supervisor would be Hubert Connolly ("Connolly"), a man Darden remembered for his "active disparagement of [Darden] on the issue of race." (Compl., ¶ 11(m).) Darden alleges that he had complained previously about Connolly's disparagement, but, again, Darden does not state to whom he complained. Upon receiving the notice of his transfer, Darden wrote Stoekl on the same day to inform her of his prior bad experiences with Connolly and of his intent instead to appear for work at the New York office, presumably meaning CSI. According to Darden, when he arrived at the New York office, he was locked out. Thus, Darden states he was "arbitrarily retired against his will" and deprived of severance pay. (Compl., ¶ 12.)

The procedural history of this matter is also relevant to the instant motion to dismiss. Darden filed this action on June 7, 2001. Darden apparently attempted to serve Defendants on June 8, 2001; Defendants assert that Darden's effort was not effective. Darden attempted to serve DCAG at the CSI offices in New York. According to Defendants, DCAG does not have offices in New York and has not authorized CSI or its personnel to accept service on its behalf. By Defendants' account, on June 8, 2001, a process server deposited multiple copies of a summons and complaint for Defendants, including DCAG, on an empty desk in the presence of a CSI secretary who refused to accept service. Darden provides a different version of the service of process. Darden submitted the affidavit of Ralph Addonizzio ("Addonizzio") the process server he employed to serve Defendants. Addonizzio stated that he served the offices of CSI on June 7, 2001 by handing the summons and complaint to a woman with a foreign accent whom he believed to be Stoekl.

By stipulation, Defendants' time to answer or respond to the complaint was extended. Plaintiff thereafter amended the complaint and served it on Defendants' attorney on September 12, 2001; it was filed with the Court on November 15, 2001.[1]

## II. *DISCUSSION*

Defendants seek dismissal of the Complaint on several different grounds pursuant to Fed.R.Civ.P. 12(b). The Court considers the jurisdictional issues first, because a dismissal for lack of jurisdiction renders all other claims moot. *Ruhrgas A.G. v. Marathon Oil Co.*, 526 U.S. 574, 583, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999) ("Article III generally requires a federal court to satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case."); *Calero v. Immigration and Naturalization Service*, 957 F.2d 50 (2d Cir.1992); *Da Silva v. Kinsho Int'l Corp.*, 229 F.3d 358 (2d Cir.2000). A court may find it appropriate to consider personal jurisdiction before subject matter jurisdiction. *See Ruhrgas*, 526 U.S. at 578, 119 S.Ct. 1563. For the reasons set forth below, the Court finds it appropriate to address Defendants' motion to dismiss pursuant to 12(b)(5) before reaching their motion to dismiss for lack of subject matter jurisdiction pursuant to 12(b)(1).

---

1. The delay in filing the Complaint was due to Darden's failure to follow Local Civil Rule 11.1(b).

Defendants base their motion to dismiss on two grounds: Darden's efforts to serve Defendants with the original complaint and the sufficiency of the claims contained in the Amended Complaint. Defendants do not move to dismiss Darden's claims of race discrimination under 42 U.S.C. § 1981 and the HRL made against CSI and Stoekl.

## A. INSUFFICIENT SERVICE OF PROCESS

Defendants claim that Darden failed to properly serve them. Nevertheless, with the exception of DCAG, Defendants waived service of process. (Memorandum of Law in Support of Defendants' Motion for the Partial Dismissal of the First Amended Complaint, at 8 n. 6.) DCAG presses the process point.

Once a defendant raises a challenge to the sufficiency of service of process, the plaintiff bears the burden of proving its adequacy. *See Howard v. Klynveld Peat Marwick Goerdeler,* 977 F.Supp. 654, 658 (S.D.N.Y.1997), *aff'd,* 173 F.3d 844 (2d Cir. 1999). Conclusory statements are insufficient to overcome a defendant's sworn affidavit that he was not served. *See id.* If service of process was not sufficient, the Court has discretion to dismiss the action, but dismissal is not mandatory. *See* Fed. R.Civ.P. 12(b)(5); *Zen Music, Inc. v. CVS Corp.,* No. 98 Civ. 4246, 1998 WL 912102, at *4 (S.D.N.Y. Dec. 20, 1998). Similar to a motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction, in considering a motion to dismiss pursuant to 12(b)(5) for insufficiency of process, a Court must look to matters outside the complaint to determine whether it has jurisdiction.

There is no dispute that DCAG is a foreign stock corporation. To effect service on a foreign corporation a party must comply with the rules of the forum state, here the State of New York. *See* Fed.R.Civ.P. 4(h). Under New York law, to effect service on a foreign corporation a party must serve both the New York Department of State and the foreign corporation at its foreign offices. *See* N.Y. Bus. Corp. L. § 307; *Weinstein v. Volkswagen of America, Inc.,* No. 88 C 1932, 1989 WL 35950 *3 (E.D.N.Y. Apr. 4, 1989). Because service on a foreign corporation requires the transmittal of a judicial document abroad, the Hague Convention on the Service Abroad of Judicial and Extra–Judicial Documents ("Hague Convention") applies and preempts contrary state law. *See Volkswagenwerk AG v. Schlunk,* 486 U.S. 694, 700, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988). By Darden's own account, however, Darden failed to comply with either New York law or the Hague Convention because Darden did not attempt to serve DCAG in Germany nor serve the New York Secretary of State here.

Darden argues that CSI is a subsidiary of DCAG, and that, under an exception to the Hague Convention, service on CSI effected service on DCAG. The subsidiary exception would apply if Darden could show that CSI is "the foreign parent's general agent in New York or is so dominated by the foreign parent as to be a 'mere department' of the parent." *International Cultural Prop. Soc. v. Walter de Gruyter & Co.,* No. 99 Civ. 12329, 2000 WL 943319,*1–*2 (S.D.N.Y. July 6, 2000) (citing *Low v. BMW, AG,* 88 A.D.2d 504, 449 N.Y.S.2d 733, 735 (App. Div. 1st Dep't 1992)). A specific factual showing of an agency relationship is necessary. *Id.* at *2; *see also Jerge v. Potter,* No. 99–CV–0312, 2000 WL 1160459,*2 (W.D.N.Y. Aug. 11, 2000). To show an agency relationship, a party must show more than mere ownership, *Jerge,* 2000 WL at *2, and should show that: "[t]he subsidiary does all the business which [the parent corporation] could do were it here by its

own officials." *Int'l Cultural Prop. Soc.*, 2000 WL at *2 (citation and internal quotations omitted). Alternately, to show that a domestic company is a mere department of the foreign corporation, a plaintiff should address four factors: common ownership; financial dependency of the subsidiary on the parent corporation; the parent's control over the subsidiary's selection of executives and observance of corporate formalities; the parent's control over the subsidiaries' marketing and operations. *Id.* at *2 (citing *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184–185 (2d Cir.1998)) (internal quotations and citations omitted).

In the Complaint, Darden alleged that Stoekl was employed by DCAG "and/or" CSI in 1999 and that her job functions entailed arranging for Board meetings between DCAG, NAH and MBUSA. Further, Darden alleges that Stoekl made statements that her relationship with Schrempp, the chairman of DCAG, was close and ensured her employment. In further support of his argument that CSI is DCAG's agent or department, Darden submitted the affidavit of Pohl, the former president and chief executive officer of DaimlerBenz North America Corporation. Pohl states that CSI "was set up as the corporate unit of [DCAG] in certain service related aspects" and that CSI was "operated in a way so dominated as it was by Mr. Schrempp that it had no independence from him." (Affidavit of Timotheus R. Pohl, dated Nov. 15, 2001 ("Pohl Aff."), at ¶ 8, 10.) Darden's Complaint and Pohl's conclusory statements generally show a relationship between DCAG and CSI, but do not address the specific analysis required by law. Thus, Darden's allegations of an agency relationship between DCAG and CSI, or CSI's mere department status, are not supported by sufficient factual specificity. *See Int'l Cultural Prop. Soc.*, 2000 WL at *2. Because Darden failed to carry his burden, the Court concludes that service of process on DCAG was not effected.

In anticipation that the Court's determination regarding service of DCAG may be unfavorable, Darden requested that the Court grant him additional time to serve DCAG in compliance with the Hague Convention. In light of the discussion set forth below, see *infra*, discussion at II.B. and II.C., the Court exercises its discretion under Fed.R.Civ.P. 12(b)(5) and 4(m) to grant Darden's request. *See Advanced Portfolio Technologies, Inc. v. Advanced Portfolio Technologies, Ltd.*, No. 94 Civ. 5620, 1999 WL 64283, *8 (S.D.N.Y. Feb. 8, 1999) (citing *Mejia v. Castle Hotel Inc.*, 164 F.R.D. 343 (S.D.N.Y.1996) and *Simmons v. Warden*, No. 92 Civ. 7615, 1996 WL 79321, *5 (S.D.N.Y. Feb. 23), *aff'd*, 104 F.3d 350 (2d Cir.1996)). Thus, if the second amended complaint contains a short and plain statement of the grounds upon which subject matter jurisdiction over DCAG is based, as well as sufficient facts in support of those allegations, Darden may attempt to serve DCAG a second time.

## B. LACK OF SUBJECT MATTER JURISDICTION

On a motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(1), it is the Court's duty to resolve disputed jurisdictional facts. *See Cargill International S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1019 (2d Cir. 1993); *see also Ruhrgas*, 526 U.S. at 583, 119 S.Ct. 1563; *Lyndonville Savings Bank & Trust Co. v. Lussier*, 211 F.3d 697, 700 (2d Cir.2000) ("[F]ailure of subject matter jurisdiction is not waivable and may be raised at any time by a party or the court *sua sponte.*"). The Court may fulfill its duty by reference to evidence outside the pleadings. *See Zappia Middle East Construction Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir.2000). Furthermore,

in resolving a challenge to subject matter jurisdiction, the Court is not obligated to draw inferences in favor of the plaintiff. *See Newsom–Lang v. Warren International,* 129 F.Supp.2d 662, 663–64 (S.D.N.Y. 2001).

### 1. *Lack of Subject Matter Jurisdiction over DCAG, NAH and Stoekl*

■ Defendants claim that Darden lacks subject matter jurisdiction over DCAG, NAH and Stoekl because he did not name them in the charge he filed with the EEOC.[2] As a general rule, a court lacks jurisdiction to hear a civil action against a party that was not already named in an EEOC charge. See 42 U.S.C. § 2000e–5(b); *Alcena v. Raine,* 692 F.Supp. 261, 269 (S.D.N.Y.1988); *Campbell v. International Brotherhood of Teamsters,* 69 F.Supp.2d 380, 387 (E.D.N.Y. 1999). The purpose of this requirement is to give defendants adequate notice of the claims and an opportunity to voluntarily comply with Title VII's strictures. *See Alcena,* 692 F.Supp. at 269. Failure to name a defendant in an EEOC charge, however, does not prohibit a plaintiff from asserting claims made under 42 U.S.C. § 1981 that may be based on the same core events. *See Stewart v. Wappingers Central Sch. Dist.,* 437 F.Supp. 250, 253 (S.D.N.Y.1977) (citing *Johnson v. Railway Express Agency,* 421 U.S. 454, 460–61, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) and *Gresham v. Chambers,* 501 F.2d 687 (2d Cir.1974)).

■ However, if there is an "identity of interest as between the parties" then a Court may overlook a plaintiff's failure to comply with the EEOC filing requirement. *See Johnson v. Palma,* 931 F.2d 203 (2d

Cir.1991). The Second Circuit instructed Courts, in determining whether a plaintiff qualifies under the "identity of interest" exception, to consider four factors:

"1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interest of a named [party] are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party."

*Id.* at 209–10 (quoting *Glus v. G.C. Murphy Co.,* 562 F.2d 880, 888 (3d Cir.1977)). The purpose of this exception is to avoid frustration of Title VII's remedial goals by accommodating plaintiffs who are not well versed in the statute's procedural formalities and requirements. *Id.* at 209; *Alcena v. Raine,* 692 F.Supp. 261, 269 (S.D.N.Y. 1988) ("Exceptions to the general rule may be granted when failure to comply does not contravene the purpose of the requirement [to file an EEOC complaint].")

■ Thus, the identity of interest exception has been held to apply where the complainant was unrepresented by counsel when he filed his claim with the EEOC. *Harrington v. Hudson Sheraton Corp.,* 2 F.Supp.2d 475, 478 (S.D.N.Y.1998) (holding

---

2. Defendants claim that this Court lacks subject matter jurisdiction to hear claims for personal liability against Stoekl because neither Title VII nor the ADEA impose personal liability. Darden responded that he bases his claim for personal liability against Stoekl only on HRL, N.Y. Exec. L. § 296. To the extent that there are any other claims asserted in the Complaint against Stoekl, they are dismissed.

that the identity of interest exception does not apply where plaintiff was represented by counsel when she filed her charge with the EEOC); *Campbell,* 69 F.Supp.2d at 387 (same); *Gagliardi v. Universal Outdoor Holdings,* 137 F.Supp.2d 374, 379 (S.D.N.Y.2001) (same). Here, Darden alleged that: "On April 4, 2000 plaintiff consulted counsel and prepared a complaint against the defendants, alleging discrimination as to race, age and retaliation for filing with the EEOC. On April 13, the day the EEOC complaint was filed...." (Compl., ¶¶ 11(1–m).) Accordingly, because Darden had the benefit of counsel when he filed his EEOC complaint, and does not claim that his counsel was unversed in the law, the identity of interest exception does not apply and his Title VII claims against DCAG and NAH must be dismissed.

Even if Darden filed his EEOC charge *pro se,* his argument that there is a "clear identity of interest" between CSI and "the parent company," [3] which the Court is left to presume is evinced by the Pohl Affidavit, would fail. (*See supra* Discussion at II.B.) The Pohl Affidavit addresses only DCAG and merely goes to the fourth *Johnson* factor to show a relationship between DCAG and Darden. The first three factors weigh in DCAG's favor. As to the first factor, Darden was aware of the existence of DCAG not only because he "drove top management of the companies in the New York area on their trips from Germany" but also because, as he alleges, Stoekl repeatedly informed him of her supervisory powers that flowed from her connec-

tions with DCAG and its Chairman, Schrempp. (Compl., ¶ 10, 11(c, e).)

Considering the second factor, whether DCAG's interests in this suit are the same as CSI's is not at all clear because, as Defendants argue, an EEOC investigation might have determined that DCAG did not control Darden's employment or that Darden has not made allegations of DCAG's personal involvement in his mistreatment. Furthermore, as a foreign corporation, DCAG's interests are distinct from those of domestic corporations. Thus, the interests of DCAG and CSI in this case probably diverge. In addition, regarding the third factor, by Darden omitting to name DCAG in the EEOC proceedings, DCAG lost that opportunity to resolve the dispute voluntarily without resort to a federal court. That loss constitutes some prejudice to DCAG. For all these reasons, Darden's argument fails and, on this record, the Court would dismiss Darden's Title VII and ADEA claims brought against DCAG.

Finally, Darden provides no excuse for failing, or reason why he should be excused from the requirement, to name NAH in the EEOC complaint.[4] Accordingly, the Court grants Defendant's motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(1), Darden's Title VII and ADEA claims against NAH.

### 2. Lack of Subject Matter Jurisdiction Over CSI

 Defendants move to dismiss, pursuant to Fed.R.Civ.P. 12(b)(1) "and/or"

---

3. Darden does not specify whether "the parent company" of CSI, to which he refers here, is DCAG or NAH. Even though DCAG has not been served properly, the Court will address Darden's arguments regarding subject matter jurisdiction over it in part because the allegations in the Complaint evince the importance of DCAG to Darden's claims.

4. Although the documents attached as Exhibit A to the Pohl Affidavit appear to describe NAH's corporate structure, Pohl does not address the documents in his affidavit. Thus the source of the documents is unknown and their authenticity left in question. In light of Defendant's objection to the "improper" affidavit, the Court declines to consider Exhibit A to the Pohl Affidavit.

12(b)(6), Darden's claims against CSI under Title VII and the ADEA because CSI is not an "employer" within the meaning of those federal statutes. There is some uncertainty in the case law as to whether the Title VII definition of employer is a matter that may be raised on a Fed.R.Civ.P. 12(b)(1) motion.

The Supreme Court has upheld dismissal of Title VII claims on the ground of lack of subject matter jurisdiction where the matter at issue concerned whether particular parties qualified under the Title VII definition of "employer". *See EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991); *Walters v. Metropolitan Educational Enterprises, Inc.*, 519 U.S. 202, 204, 117 S.Ct. 660, 136 L.Ed.2d 644 (1997); *see also Hishon v. King & Spalding*, 467 U.S. 69, 73–78, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). Courts in the Second Circuit have done likewise. *See, e.g., Guadagno v. Wallack Ader Levithan Assoc.*, 932 F.Supp. 94, 96 (S.D.N.Y.1996); *Serrano v. 900 5th Ave. Corp.*, 4 F.Supp.2d. 315, 316 (S.D.N.Y. 1998); *Keller v. Niskayuna Consolidated Fire District 1*, 51 F.Supp.2d 223, 226 (N.D.N.Y.1999). Recently, however, the Second Circuit expressly declined to treat the definition of employer as a matter of subject matter jurisdiction. *See Da Silva*, 229 F.3d at 358.

In *Da Silva*, defendants, claiming they employed fewer than requisite number of employees, moved to dismiss for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). Plaintiff countered that for the purposes of Title VII, defendant Kinsho and its foreign parent corporation were a single employer and that the parent's employees thus should be counted in determining the number of employees issue for jurisdictional purposes. *See Da Silva v. Kinsho Int'l Corp.*, No. 97 Civ. 5030, 1998 WL 560054, *1 (S.D.N.Y. Aug. 31, 1998). The District

Court denied the motion and ordered the parties to proceed with discovery. *See id.* The case was subsequently transferred to another judge before whom defendants again raised the issue of subject matter jurisdiction. The court held a bench trial on the subject matter jurisdiction issue in the morning, reserved decision and commenced a jury trial on the merits of the case in the afternoon. *See Da Silva v. Kinsho Int'l Corp.*, No. 97 Civ. 5030, 2000 WL 8247, *1–*2 (S.D.N.Y. Jan. 4, 2000). Later the same day the court ruled that Kinsho was a separate entity from its parent for Title VII purposes and dismissed the Title VII claim for lack of subject matter jurisdiction but, exercising supplemental jurisdiction, continued with the trial on state and local claims. *See Da Silva*, 229 F.3d at 360.

While the jury deliberated, the court requested additional briefing of the discrete issue as characterized by the Second Circuit to be: "is the requirement that an employer have fifteen employees a prerequisite to the exercise of subject matter jurisdiction, or is it instead merely a component of the cause of action?" *Id.* at 360–61. Before the court ruled on that question, the jury returned with a verdict against the plaintiff. The district court subsequently concluded that Kinsho's failure to qualify as an "employer" was not jurisdictional, that dismissal of the Title VII claim under Fed.R.Civ.P. 12(b)(6) for failure to state a claim rather than under 12(b)(1) for lack of jurisdiction was proper, and that the court therefore could exercise supplemental jurisdiction over the non-federal claims. *See id.* at 361.

On appeal, having argued in favor of subject matter jurisdiction throughout trial, the plaintiff deftly switched to argue its absence in order to preserve the right to relitigate the claims in state court. Defendants, seeking to uphold the jury's verdict,

made a similar about-face and argued that the District Court's ruling on the number of employees issue concerned the merits of plaintiff's claim. *See id.* at 360.

To answer the discrete question of subject matter jurisdiction, the Second Circuit first addressed itself to what it characterized as an important, but often obscured issue. *See id.* at 362. It discerned four categories of issues that illustrate the spectrum between the jurisdictional aspects and merits of a matter. On one end are the clearest jurisdictional issues: whether a court has federal question or diversity jurisdiction to hear a matter. *See id.* at 363 (citing 28 U.S.C. §§ 1331 and 1332). Less clearly placed on the spectrum are jurisdictional questions concerning the existence of a fact essential to determine whether Congress may constitutionally exercise its power to regulate. *See id.* at 363 (citing *Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976)).

A third category are disputes concerning a claim that falls within the ambit of a statute as enacted by Congress with respect to a matter Congress clearly has the power to regulate. *See id.* (citing *Hishon*, 467 U.S. at 73–78, 104 S.Ct. 2229). Finally, the Court described the fourth category of disputes in which it determined that Da Silva's case fell: those that concern "the existence of a fact (here, 15 or more employees) that Congress has specified as a prerequisite for the application of a federal statute." *Id.*

The Second Circuit's analysis of the decisive issue rests on two foundations: first, its express concern for "the consequences of a determination that some fact or circumstance is an ingredient of subject matter jurisdiction", *id.* at 365; and, second, the statutory language. Regarding the consequences, the Circuit Court noted that if subject matter jurisdiction is lacking, "all actions of a federal court are void, and a trial on pendent state law claims, no matter how fully and fairly conducted, must be disregarded." *Id.* Furthermore, the inquiry becomes yet another matter as to which "the trial court and the reviewing court have an obligation to make their own independent determination." *Id.*

Bearing these consequences in mind, and acknowledging the split among Circuit Courts on the central question,[5] the Second Circuit observed that "the institutional requirements of a judicial system weigh in favor of narrowing the number of facts or circumstances that determine subject matter jurisdiction." *Id.* The court then proceeded to analyze Title VII's jurisdictional provision, which declares that: "Each United States district court . . . shall have jurisdiction over actions brought under this subchapter [Title VII]." *Id.* (quoting 42 U.S.C. § 2000e–5). By its reading, the words "brought under" are "less exacting" than the standard "arising under" jurisdictional language used in, for example, 28 U.S.C. § 1332. *Id.* Thus, by "endeavor[ing] to plead that an employer covered by Title VII has violated its prohibition", a plaintiff has sufficiently invoked a federal court's subject matter jurisdiction. *Id.* This construction permits defendants to

**5.** In *Sharpe v. Jefferson Distributing Co.*, 148 F.3d 676, 677 (7th Cir.1998), the Seventh Circuit, abrogating an earlier precedent applying the Age Discrimination in Employment Act, 29 U.S.C. § 630(b), ruled that the fifteen-employee requirement of Title VII is not jurisdictional, a holding later reaffirmed under a different factual analysis the Circuit Court adopted. *See Papa v. Katy Industries*, 166 F.3d 937, 939–43 (7th Cir.1999). *See also EEOC v. St. Francis Xavier Parochial School*, 117 F.3d 621, 623–25 (D.C.Cir.1997); *but see Scarfo v. Ginsberg*, 175 F.3d 957, 960 (11th Cir.1999); *Greenlees v. Eidenmuller Enterprises, Inc.*, 32 F.3d 197, 198 (5th Cir.1994); *Childs v. Local 18, IBEW*, 719 F.2d 1379, 1382 (9th Cir.1983); *Armbruster v. Quinn*, 711 F.2d 1332, 1335 (6th Cir.1983).

challenge employer status on a motion for summary judgment, or on a Rule 12(b)(6) motion if the complaint on its face shows that the employer has fewer than fifteen employees. *See id.* at 366. The matter might only be challenged on a Rule 12(b)(1) motion if the plaintiff's claim appears "frivolous or plainly insubstantial." *See id.*

Supreme Court precedents sustaining dismissals of Title VII actions that implicated the definition of employer and were grounded on the lack of subject matter jurisdiction were not squarely addressed by the Second Circuit's opinion. *See Arabian American Oil,* 499 U.S. at 244, 111 S.Ct. 1227; *Walters,* 519 U.S. at 204, 117 S.Ct. 660; *see also Hishon,* 467 U.S. at 73–78, 104 S.Ct. 2229. However, the Circuit Court observed that in those cases the Supreme Court did not have occasion to rule on the precise issue. *See, e.g., Da Silva,* 229 F.3d at 363. The Court noted, for example, that in *Hishon* the Supreme Court "declined to consider 'the wisdom of the District Court's invocation of Rule 12(b)(1), as opposed to Rule 12(b)(6)'." (quoting *Hishon,* 467 U.S. at 73 n. 2, 104 S.Ct. 2229), and that in *Arabian American Oil,* the Supreme Court, although agreeing with the District Court's view concerning the limited reach of the statute, did not comment on whether the dismissal had been properly based on absence of subject matter jurisdiction rather than failure to state a claim. *See id.*

Given the paucity of the Supreme Court's consideration of the question, the Second Circuit adopted the view of other circuits which had similarly found the Supreme Court precedents to be unpersuasive authority given their lack of discussion devoted to the discrete issue. *See id.* at 363–64 (citing *Francis Parochial School,* 117 F.3d at 623–25 and *Sharpe,* 148 F.3d at 677).

Post *Da Silva,* at least one district court in this Circuit has followed and extended the Second Circuit's analysis to the context of an ADEA claim. *See Newsom–Lang,* 129 F.Supp.2d at 662. The ADEA's jurisdictional statute provides that: "Any person aggrieved may bring a civil action in any court of competent jurisdiction for such legal and equitable relief as will effectuate the purposes of this chapter." 42 U.S.C. § 626(c). The statutory analysis under the ADEA cuts more strongly against the inclusion of the employer definition into subject matter jurisdiction because whether a person was "aggrieved" logically cannot be shown "absent proof of a prohibited practice by an employer." *Id.* at 665 (citing 42 U.S.C. §§ 626(c) and 2000e–2(a)). In *Newsom–Lang,* the court made an additional argument for exclusion of the employer requirement from the subject matter jurisdiction recipe: "Congress chose not to incorporate [the employee requirement] into the jurisdictional provision of the statute." *Id.* (citing *Da Silva,* 229 F.3d at 364–65 and *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946)). On that basis, the court rejected defendant's 12(b)(1) motion as improper because "the alleged infirmity with respect to employee census is not apparent from the face of the complaint and the conclusory factual information thus far proffered conflicts in material respects." On this basis, the court directed the parties to concentrate discovery thereon. *Id.* at 665–66.

In the instant case, consistent with the foregoing analysis, the Court declines to treat Title VII's number of employees issue as a jurisdictional question. Even so, whether the Court addresses Defendants' argument that DCAG does not qualify as an employer under Title VII on a motion to dismiss pursuant to Rule 12(b)(1) or Rule 12(b)(6), the ultimate disposition of Defendants' motion does not vary. As already discussed, Darden submitted conclu-

sory and bare allegations regarding the relationship between CSI and DCAG and their employment rolls. Thus, on the record before the Court, Darden fails to carry his burden of establishing subject matter jurisdiction. Nor has this round of briefing on the motion at hand assisted the Court in its enforcement of subject matter jurisdiction delineations. Similarly, but for the reasons set forth below, see discussion *infra* at II.C.1., the Complaint, on its face, does not throw CSI's employer status into question. Rather, and albeit through vague and unsubstantiated allegations concerning the Defendants' corporate affiliations, the Complaint raises some factual questions as to CSI's status vis-a-vis the other named Defendants. Accordingly, under either analysis, justice would be best served by allowing Darden to file a second amended complaint addressing these jurisdictional deficiencies with more particularity.

The Court's analysis of its jurisdiction over this civil action leaves it with federal claims still remaining against CSI and MBUSA. However, the full briefing in this matter indicates that, if given an opportunity to amend the Complaint a second time, Darden might be able to file a complaint that clearly sets forth the Court's jurisdiction and might properly accomplish service of process on all defendants. Once that is accomplished, the Court may address the sufficiency of his claims as to DCAG and NAH.

## C. FAILURE TO STATE A CLAIM

Defendants also sought dismissal, pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim, of Darden's claims on the merits of his pleading. A district court may grant a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) only if it appears beyond doubt that the non-moving party could prove no set of facts that would entitle it to relief. *See Hishon*, 467 U.S. at 73, 104 S.Ct. 2229 (1984); *Valmonte v.*

*Bane*, 18 F.3d 992, 998 (2d Cir.1994). On a motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6) a Court draws all reasonable inferences of well-pleaded factual assertions in favor of the plaintiff. *See Hishon*, 467 U.S. at 73, 104 S.Ct. 2229. However, unlike motions to dismiss made pursuant to 12(b)(1) and 12(b)(5), the Court does not look to matters outside of the pleadings. To do so would convert the motion into one for summary judgment, which, at this stage of the proceedings, the Court declines to do. *See Friedl v. City of New York*, 210 F.3d 79, 83–84 (2d Cir. 2000).

### 1. Failure to State a Claim Against CSI

As already discussed, Defendants assert that CSI is not an "employer" within the meaning of Title VII or the ADEA. As such, they argue, Darden has failed to state a claim and it must be dismissed. Defendants, however, do not argue that Darden failed to state a claim against CSI under 42 U.S.C. § 1981.

An "employer" under Title VII is defined to be "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. § 2000e(b); *Kern v. City of Rochester*, 93 F.3d 38, 45 (2d Cir.1996) (affirming dismissal where district court found that defendant lacked requisite number or employees, without leave to amend). Likewise, an employer under the ADEA is defined to be "a person engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 29 U.S.C. § 630(b).

Regardless of the fact that the Complaint does not specify the number of em-

ployees at CSI, Darden concedes that CSI did not employ the minimum number of employees required by either statute. Rather, Darden argues that "CSI is a creature of the parent German corporation and that for liability purposes, plaintiff was the employee of [DCAG]." (Pl.'s Mem. at 14.) As legal support for his argument, Darden cites *Morelli v. Cedel*, 141 F.3d 39 (2d Cir.1998). This case provides little support because, the employer in *Morelli* was a foreign, single corporate entity with a New York branch office. In that situation, the Second Circuit held that a court should consider a foreign company's domestic and foreign employees in calculating the number of employees for purposes of an ADEA claim. *Id.* at 45.

Here, however, according to Darden's own pleadings, CSI and DCAG are distinct corporate entities. (Compl., ¶ 7.) This distinction is significant because Congress intended Title VII's definition of employer to exclude small businesses. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1314 (2d Cir. 1995).[6] In addition, as a matter of policy, courts presume the separateness of legally distinct corporate entities. *See Volkswagenwerk AG v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir.1984); *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir.1996); *Coraggio v. Time Inc. Magazine Co.*, No. 94 Civ. 5429, 1995 WL 242047, *2 (S.D.N.Y. Apr. 26, 1995).

In light of CSI and DCAG's separate and distinct legal forms, the *Morelli* decision does not support Darden's argument under either Title VII or the ADEA. *See Greenbaum v. Svenska Handlesbanken*, 26 F.Supp.2d 649, 651 (S.D.N.Y.1998) (holding *Morelli* equally applicable in the Title VII context). Accordingly, Darden's allegations are insufficient to bring CSI into the purview of Title VII or the ADEA's definition of employer and the Court must dismiss Darden's claims against CSI for failure to satisfy the elements of a cause of action under either statute, and thus to state a claim sufficient to defeat a Rule 12(b)(6) motion to dismiss.

■■■ Nevertheless, in the context of separate corporate entities, a Court may calculate the number of employees by reference to the parent's employment rolls if the two distinct entities "collapse" into a single employer. *See Coraggio*, 1995 WL at *1. The Second Circuit instructs that a single employer collapse between a parent and subsidiary occurs only where two businesses have (1) interrelated operations, (2) centralized control of labor relations, (3) common management and (4) common ownership or financial control. *See Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir.1995) (citing *Garcia v. Elf Atochem North America*, 28 F.3d 446, 450 (5th Cir.1994)) and *Baker v. Stuart Broadcasting Co.*, 560 F.2d 389, 392 (8th Cir.1977).[7] The most essential factor is

---

**6.** While no legislative history exists to guide the Court on this issue, it is likely that the minimum employee requirement was enacted under the ADEA for the same reasons it was enacted in Title VII. *See generally* 42 U.S.C. § 12117; *Harrison v. New York City Off–Track Betting Corp.*, 107 F.Supp.2d 455, 458 (S.D.N.Y.2000) ("The ADEA specifically incorporates the powers, remedies and procedures of Title VII.").

**7.** Darden also cites earlier cases that no longer provides an accurate statement of the law in this Circuit. *See, e.g., Clinton's Ditch Coop-*

*erative Co. Inc. v. NLRB*, 778 F.2d 132, 137 (2d Cir.1985). In *Cook*, the Second Circuit adopted the four-part test which was first promulgated by the N.L.R.B., approved by the Supreme Court, and is followed in other circuits. *See Cook*, 69 F.3d at 1240–41 (listing cases); *see also Radio Union v. Broadcast Service*, 380 U.S. 255, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965); ; *Armbruster v. Quinn*, 711 F.2d 1332 (6th Cir.1983); *Morgan v. Safeway Stores, Inc.*, 884 F.2d 1211, 1213 (9th Cir.1989); *Brown v. Vitelcom. Inc.*, 47 F.Supp.2d 595 (D.Vi.1999).

the second. In consideration of that factor, a court should determine what entity made the final employment decisions relating to the person claiming discrimination. *See id.* at 1240.

Here, Darden alleges that it was Pohl and Stoekl who made him the offer to work at CSI; and that it was Stoekl who supervised him and delivered to him the transfer letter dated April 13, 2000. He does not allege that any other person or entity participated in these employment decisions. Thus, on the basis of Darden's pleadings, the second essential *Cook* factor weighs against a finding of single employer collapse.

Darden's Complaint does not provide a sufficient showing of the three remaining factors, either. In particular, Darden has not alleged or shown that the operations of CSI and DCAG were interrelated, or that their management, ownership or finances were in common. At best, Darden's Complaint merely alleges that the CSI and DCAG were related in some way and that the board of directors of DCAG, NAH and MBUSA had meetings together that Darden believes implies a connection among them. On the record before the Court, to disregard the corporate distinction between DCAG and CSI and to deem CSI to be an "employer" by adding to its employment rolls those of DCAG, would be both unprecedented and contrary to congressional intent.

### 2. *Failure to State a Claim Against MBUSA and NAH*

Defendants assert that Darden failed to state a claim against MBUSA because he failed to allege MBUSA's or NAH's personal involvement in the alleged discrimination, as required by 42 U.S.C. § 1981, and because Darden did not allege that MBUSA or NAH employed him at the relevant time. Here, the discriminatory acts Darden complains of were not clearly taken by MBUSA or NAH or their employees.

According to § 1981, "all persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens." Thus, to state a claim under § 1981, a plaintiff must show that he was: (1) a member of a racial minority; (2) subjected to intentional discrimination; and (3) that this discrimination interfered with a contractual relationship or other activities enumerated in the statute. *See Mian v. Donaldson, Lufkin & Jenrette Securities Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993); *Krulik v. Board of Educ.,* 781 F.2d 15, 23 (2d Cir.1986) (citing *General Building Contractors Assoc. v. Pennsylvania,* 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982), *Runyon v. McCrary,* 427 U.S. 160, 170–71, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) and *Red Elk v. Vig,* 571 F.Supp. 422, 424 (W.D.S.D.1983) (internal citations omitted)); *EEOC v. Die Fliedermaus, L.L.C.,* 77 F.Supp.2d 460, 469 (S.D.N.Y.1999). Claims brought under § 1981 are analyzed under the same framework as those brought under Title VII. *See Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 69 (2d Cir.2000). Vicarious liability and respondeat superior theories provide no substitute for the essential element of intentional discrimination. *See General Building Contractors,* 458 U.S. at 393–97, 102 S.Ct. 3141. Finally, a corporation cannot be held liable for the actions of another, separate company "merely because it has an ownership interest in it." *Maung Ng We v. Merrill Lynch & Co.,* No. 99 Civ. 9687, 2000 WL 1159835, *3 (S.D.N.Y. Aug. 15, 2000).

In the instant case, Darden has alleged the crucial element of discriminatory intent only on the part of Stoekl and CSI. *See Whidbee,* 223 F.3d at 72. Further, the Court construes the relevant contractual

relationship to be the employment contract between Darden and CSI. *See Die Fliedermaus,* 77 F.Supp.2d at 469–70. Nevertheless, Darden does not allege that MBUSA or NAH employed him. Nor does Darden oppose Defendants' motion on any grounds other than the employment relationship. As these entities are outside the privity of the employer-employee relationship, and no other contractual relationship is at issue, Darden must show some alternate basis for the imposition of liability as to MBUSA and NAH.

Defendants argue that to impose liability for the alleged violation of § 1981, Darden must show their personal involvement in the wrongdoing. The imposition of individual liability under § 1981 depends on a plaintiff's demonstration of " 'some affirmative link to employment discrimination under § 1981.' " *Whidbee,* 223 F.3d at 75 (quoting *Allen v. Denver Pub. Sch. Bd.,* 928 F.2d 978, 983 (10th Cir.1991)). Personal involvement may be shown where a supervisor had knowledge of the alleged acts of discrimination and failed to remedy or prevent them. *Amin v. Quad/Graphics,* 929 F.Supp. 73, 78 (N.D.N.Y.1996). Here, it does not appear that Darden seeks the personal liability of the other corporate Defendants.

Darden claims that an agency relationship will suffice to state a claim for interference with contract in violation of § 1981. Darden is correct that a parent corporation will not be held liable for the torts of its subsidiary unless the Court has reason to pierce the corporate veil or to find that the tortious conduct was pursuant to an agency relationship. *See Maung Ng We,* 2000 WL 1159835, at*3–*4. In a similar vein, an employer-entity's agent may face liability under § 1981. *See Tomka,* 66 F.3d at 1316. However, Darden does not allege that MBUSA or NAH acted as CSI or Stoekl's agents, or participated at all, in the alleged discrimination.

Rather, he asserts that these corporations should be liable as principals of CSI and Stoekl.

The existence of an agency relationship has provided grounds for the principal's liability for its agent's violation of § 1981. *See Yates v. Hagerstown Lodge No. 212 Loyal Order of the Moose,* 878 F.Supp. 788, 797–98 (D.Md.1995). In *Yates,* the court considered the parent international fraternal organization's responsibility for its local chapter's acts under agency and vicarious liability theories. The examples of the principal's discriminatory intent were "manifold" because the principal knew that: (1) the agent had a racially prejudicial guest policy; (2) knew that non members had access to the agent's facilities; (3) knew of specific incidents of discrimination by the agent; (4) knew the agent postponed plaintiff's application; (5) met with the agent prior to the vote on plaintiff's application; (6) "respond[ed] to racist remarks uttered at the vote by instructing Lodge [the agent] that it could not dictate its voting procedures"; (7) "fail[ed] to object to a clearly discriminatory voting procedures"; (8) assisted in verifying the vote; (9) failed to offer membership to plaintiff; and (10) failed to intervene in the temporary termination of plaintiff's sponsor's membership in the organization. *Id.* at 797. Furthermore, the court also found that the local chapter was subject to the (1) direction and control of the international, as well as the (2) rules and regulations promulgated by the international; (3) membership policies promulgated by the international and (4) the supervision of local chapter administrators directly responsible for the local chapter's compliance with (1), (2) and (3). *Id.* at 798–99. Under either analysis, the International was found liable.

In the instant case, the allegations contained in the complaint are less compelling.

*See also Richard v. Bell Atlantic Corp.*, 946 F.Supp. 54 (D.D.C.1996) (ordering plaintiff to supplement its allegations on how the parent corporation would be liable under single-employer collapse, agency, alter-ego or instrumentality theories); *Richard v. Bell Atlantic Corp.*, 976 F.Supp. 40 (D.D.C.1997) (later proceeding applying single employer collapse theory, only); *Wayne v. Dallas Morning News*, 78 F.Supp.2d 571 (N.D.Tex.1999) (analyzing relationship between employer and parent company under single-employer collapse theory) (citing *Garcia*, 28 F.3d at 450).

Assuming that such an agency relationship would suffice, the allegations contained in the Complaint do not support Darden's assertion that either MBUSA or NAH were in an agency relationship with CSI or Stoekl.[8] The allegations in the Complaint regarding the connection between MBUSA and CSI or Stoekl are that: (1) Darden worked for MBUSA from 1990 through August, 1999; (2) Darden retained the health, pension and retirement "rights as an employee of [MBUSA]" while employed by CSI; (3) CSI is a subsidiary of MBUSA; and (4) Darden was transferred to MBUSA in April 2000 but never appeared for work there. Although Darden's allegations indicate that CSI is affiliated and maintains common benefits with MBUSA, these allegations without more do not rise to a level that warrants the imposition of § 1981 liability on MBUSA.

The deficiencies with respect to Darden's allegations of the relationship between CSI and NAH are even more striking. Darden alleges that: (1) NAH is a parent to CSI; (2) NAH had meetings with MBUSA; (3) Pohl was Vice Chairman of NAH. These allegations present far fewer allegations of interference with a contractual relationship than is necessary to survive a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6).

In sum, Darden has stated a viable § 1981 claim against his supervisor, Stoekl, and employer, CSI, only. If Darden seeks to impose § 1981 liability on MBUSA or NAH (or DCAG), he must plead facts upon which a reasonable inference of racial animus on the part by these entities may be grounded. In addition, he must plead facts that show their role in the intentional discrimination alleged, if they are to be held responsible for it. On the basis of the pleadings as they stand now, Darden has provided insufficient allegations that MBUSA or NAH had any role in, or should carry any responsibility under § 1981 for, the alleged discrimination.

### 3. Failure to State a Claim Against DCAG

Finally, Defendants sought dismissal of Darden's claims against DCAG on their merits. Defendants arguments include Darden's failure to state a claim against DCAG (1) for damages under 42 U.S.C. § 1981 because he failed to allege DCAG's personal involvement in the alleged discrimination and retaliation and (2) because Darden never alleged DCAG employed him at the relevant times. Based on the Court's determination that DCAG was not served properly the Court cannot address these matters on this motion. (*See supra* discussion at II.A.)

### 4. Failure to State a Claim Against All Defendants

Finally, Defendants assert several arguments as to why Darden's claims, which

---

**8.** Darden believes an agency relationship between Stoekl and MBUSA, NAH (and DCAG) is manifest from the allegations contained in the Complaint. In support of this argument, and yet belying his assertion, Darden would have the Court refer to the Pohl Affidavit. (Pl.'s Mem. at 10.) As already stated, the Court declines to convert this motion into one for summary judgment and accordingly rejects Darden's proffer.

apply to all Defendants, should fail. In particular, Defendants argue that Darden failed to state a claim under the ADEA because Stoekl's one allegedly discriminatory comment, made six months prior to Darden's claimed wrongful termination, provides a legally insufficient nexus for a finding of liability; that Darden's claim for retaliation fails because he does not allege that he engaged in any constitutionally protected activity for which he was punished; and that Darden failed to state a breach of contract claim for deprivation of severance pay. As the Court has already determined that it lacks subject matter jurisdiction over the federal claims brought against DCAG, that the Title VII and ADEA claims fail against NAH and CSI for other reasons, and that the 42 U.S.C. § 1981 claims fail against NAH and MBUSA, it declines to address these matters. *See Ruhrgas,* 526 U.S. at 583, 119 S.Ct. 1563; *Calero,* 957 F.2d at 50.

D. *LEAVE TO REPLEAD*

A court is to freely grant a party leave to amend its pleading "when justice so requires." Fed.R.Civ.P. 15(a). A court should deny a request to amend where there has been undue delay or bad faith, if the proposed amendment is futile, or if leave to amend will result in prejudice to the opposing party. *See State Teachers Retirement Board v. Fluor Corp.,* 654 F.2d 843 (2d Cir.1981) (citing Fed.R.Civ.P. 15(a) and *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). Here, the Court finds no undue delay or bad faith on the part of Darden. In light of the Complaint's descriptive factual recitation, and based on the full briefing submitted by Darden, the Court cannot conclude that amendment necessarily will be futile. Finally, Defendants provided no reason why they might be prejudiced by the Court's grant of leave to amend. Rather, it appears that, if given a second opportunity to amend the Complaint, Darden may

be able to plead sufficient facts to cure the subject matter jurisdiction infirmities regarding his Title VII and ADEA claims and may be able to address the deficiencies raised by Defendants in their motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). Further, in light of the vague and inconsistent allegations in the Complaint, all future proceedings in this matter would be facilitated by a second revision and further clarification by Darden. Accordingly, the Court directs Darden to file a second amended complaint as to all claims and which shall comply with Fed. R.Civ.P. 8(a) by providing: (1) a short and plain statement of the grounds upon which the jurisdiction of this court depends; (2) a short and plain statement of each claim as it related to each defendant showing that he is entitled to relief and (3) a demand for judgment of the relief sought.

### III. *ORDER*

For the foregoing reasons, it is hereby

**ORDERED** that Defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) against DCAG and NAH is granted; and it is further

**ORDERED** that Defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) against CSI is denied; and it is further

**ORDERED** that Defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) against CSI and MBUSA is granted; and it is further

**ORDERED** that the Complaint is dismissed without prejudice and Darden is granted leave to file a second amended complaint complying with the requirements of Fed.R.Civ.P. 8(a) and consistent with this Decision and Order by April 13, 2002; and it is finally

**ORDERED** that Defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(5)

is granted, with leave to serve DCAG by June 28, 2002.

**SO ORDERED.**